**ANIMAL LEGAL DEFENSE FUND**
Telephone: 707.795.2533
Facsimile: 707.795.7280

Isabel F. Callejo-Brighton (SBN 333181)
Email: icallejo-brighton@aldf.org
525 E. Cotati Ave
Cotati, CA 94931

Caitlin M. Foley (IL Bar. No. 6323904)*
Email: cfoley@aldf.org
150 South Wacker Drive, Suite 2400
Chicago, IL 60606

Ariel Flint (NYS Bar No. 5593991)*
Email: aflint@aldf.org
2125 24 St.
Astoria, NY 11105

**SMITH & LOWNEY, PLLC**
Claire Tonry (WSBA No. 44497)*
claire@smithandlowney.com
Knoll D. Lowney (WSBA No. 23457)*
knoll@smithandlowney.com
2317 E. John Street
Seattle, Washington 98112
Telephone: (206) 860-2883
Facsimile: (206) 860-4187
smithandlowney.com

* (*pro hac vices forthcoming*)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

REBECCA CAREY, and CODY
LATZER, *on behalf of themselves
and others similarly situated*,

Plaintiffs,

vs.

-1-

J.A.K.'S PUPPIES, INC., JOLYN NOETHE, KIMBERLY DOLPHIN, RUSSELL KIRK, RESCUE PETS IOWA CORP., TBHF LLC D/B/A THE PET X CHANGE, BARK ADOPTIONS, STEPHANIE VAUGHN, ANA DIAZ, PET CONNECT RESCUE, INC., RAY ROTHMAN, ALYSIA ROTHMAN, SUBJECT ENTERPRISE, INC., CODA SUBJECT, MICADA, INC. D/B/A ANIMAL KINGDOM PET SHOP, and ADAM TIPTON,

Defendants.

Case No. **5:21-cv-02095**
**COMPLAINT—CLASS ACTION**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.     The State of California has long recognized the need to protect consumers from unscrupulous animal dealers who sell puppies bred in deplorable conditions at "puppy mills." Described as "large commercial breeding facilities that mass produce animals for sale at retail markets," puppy mills are commonly associated with "producing sick animals, inhumane treatment, and providing abhorrent living conditions." A.B. 485, Assemb. Comm. on Bus. and Prof. Bill Analysis at 5 (Ca, Apr. 17, 2017). Beginning in the 1990's, the California Legislature acted to protect consumers from the perils of purchasing puppy mill puppies by requiring that retailers disclose the puppies' state of origin and known medical problems. After these requirements proved insufficient, the state enacted a complete ban on the sale of puppies—excepting bona fide rescue animals—effective January 1, 2019 (hereinafter called the "Puppy Mill Ban").

2.     Plaintiffs are California consumers who purchased puppies held out as bona fide rescue animals after the state's ban went into effect. In reality, a private broker collected the dogs from puppy mills across the county and laundered them through sham non-profits in Iowa, Missouri, and California for ultimate sale to unsuspecting consumers in California.

3.     Each of the Defendants have, both individually and collectively, knowingly participated in the unlawful and unfair activity of trafficking puppy mill puppies into California for compensation and private gain. Defendants falsified the puppies' sources and pretended to operate as, or work with, animal rescue organizations to circumvent the restrictions of California law. This "puppy laundering" scheme enabled Defendants to sell dogs to consumers who would not have otherwise supported an illegal black-market enterprise, much less paid the premium prices they did for their puppies.

4.     Plaintiffs bring this action on behalf of themselves and other similarly situated California consumers to recover the damages they incurred from Defendants' unlawful and unfair sale of puppy mill dogs and to disgorge all profits from Defendants' illegal puppy laundering ring.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Statute ("RICO") statute, 18 U.S.C. § 1961 *et seq*., under 28 U.S.C. § 1331 (federal question jurisdiction).

6.     Diversity subject matter jurisdiction also exists over this class action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), amending 28 U.S.C. § 1332(d). This class action involves: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from some defendants; and (c) where the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28 U.S.C. §§ 1332(d)(2) and (6).

7.     This Court has personal jurisdiction over the parties in this case. Plaintiffs are citizens of California and reside in Santa Barbara and San Luis Obispo Counties. Defendants have sufficient minimum contacts with California, avail themselves of the laws of the state, and distribute and sell dogs within the district.

Many acts complained of herein occurred in the district, including the illegal and deceptive sale of puppies.

8.     Venue is proper in this Court. Substantial acts in furtherance of the alleged improper conduct, including the illegal and deceptive sale of puppies, occurred in this district.

9.     Concurrently with the filing of this Complaint, Plaintiffs filed an affidavit pursuant to Cal. Civil Code § 1780(d) regarding the propriety of venue. *See* Ex. A.

**PARTIES**

**I.     Plaintiffs.**

10.     Plaintiff Rebecca Carey is a California consumer and resident of Santa Barbara County. Carey purchased a Cockapoo puppy, whom she named Sonnie, from an Animal Kingdom pet store in January 2019. Animal Kingdom represented that Sonnie came from Bark Adoptions Rescue, and Carey believed Sonnie was a rescue puppy. In truth, Sonnie came from a puppy mill, which is likely why she now suffers from permanent back and spine problems. Carey would not have purchased Sonnie if she knew she was sold in violation of California's Puppy Mill Ban and she never would have knowingly spent her money in support of a black market puppy trade.

11.     Plaintiff Cody Latzer is a California consumer and resident of San Luis Obispo County. Latzer purchased an Australian cattle dog, whom he named Sadie, from an Animal Kingdom pet store in March 2019. Animal Kingdom represented that Sadie came from Pet Connect Rescue and Latzer believed the puppy was a rescue. In fact, Pet Connect Rescue is a sham and Sadie came from a puppy mill. Like Carey, Latzer would not have supported Defendants' black market puppy trade with his hard-earned money if Defendants had not lied about Sadie's origins to evade the Puppy Mill Ban.

12.     Plaintiffs file this Complaint in their individual capacity, and as a class action on behalf of themselves and all others similarly situated. They, along with other

class members who may be named as class representatives at the time a motion is filed to certify the proposed class, will represent the following class:

> All persons who, on or after January 1, 2019, purchased dogs in the State of California supplied by J.A.K.'s. Excluded from the Class are (1) Defendants and their legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

13.    On December 9, 2021, a reasonable time after learning that the puppies sold by Animal Kingdom were in fact knowingly acquired from commercial breeders and falsely sold as legitimate "rescues," Plaintiffs notified Animal Kingdom through certified mail, return receipt requested of its alleged violations of the California Consumer Remedies Act pursuant to California Civil Code § 1782(a), including its unlawful, unfair and deceptive conduct in connection with Plaintiffs' purchase of Sonnie and Sadie. Plaintiffs demanded that Animal Kingdom rectify the problems associated with the sale. As of the filing of this Complaint, Animal Kingdom has failed to adequately respond to these demands and has failed to give notice to all affected consumers, as required by California Civil Code § 1782.

## II.    Defendants.

### *Central Broker and Supplier Defendants*.

14.    Defendant J.A.K.'s Puppies, Inc. ("J.A.K.'s"), named after its founding members, Jolyn Noethe and Kimberly Dolphin, is a for-profit puppy broker that churns through thousands of designer and pure breed puppies annually.

15.    J.A.K.'s acquires its puppies from puppy mills. Indeed, J.A.K.'s knowingly obtains and actively seeks to utilize puppies from puppy mills, including breeders without United States Department of Agriculture ("USDA") licenses, for resale to pet stores.

16.     In 2018 alone, J.A.K.'s is known to have sourced over 5,700 puppies from a mix of licensed and unlicensed breeders across the United States. This number only includes puppies whose purchase was documented in public record and is likely a mere portion of the puppies that J.A.K.'s acquired and sold that year.

17.     J.A.K.'s is located at 2685 Grant Ave., Britt, Iowa 50423. As a broker, J.A.K.'s is inspected by the USDA; an inspection report from August 2020 shows 254 puppies on site.

18.     J.A.K.'s was a defendant in a lawsuit brought by the Iowa State Attorney General regarding a puppy laundering ring that funneled commercially bred puppies through a sham non-profit, Hobo K-9 Rescue, before being sold to unsuspecting consumers throughout the country ("Iowa AG lawsuit").

19.     Defendant Jolyn Noethe is Co-President, Secretary, and Director of J.A.K.'s. She was a defendant in the Iowa AG lawsuit. She is a resident of Britt, Iowa.

20.     Defendant Kimberly Dolphin is Co-President, Secretary, and Director of J.A.K.'s. She was a defendant in the Iowa AG lawsuit. She is a resident of Britt, Iowa.

21.     Defendants Noethe, Dolphin, and J.A.K.'s are collectively referred to as "J.A.K.'s."

***Sham Rescue Defendants.***

22.     Defendant Russell Kirk was President, Secretary, Treasurer, and Director of Rescue Pets Iowa Corp., a sham Iowa nonprofit formed more than a year after California's ban on the sale of commercially bred puppies was enacted, and just two weeks before the ban's January 1, 2019 effective date. Kirk was a defendant in the Iowa AG lawsuit. Kirk is a resident of Ottumwa, Iowa.

23.     Defendant Rescue Pets Iowa Corp. ("Rescue Pets Iowa") purported to be a corporation "organized exclusively for charitable … purposes … [t]o rescue pets." Kirk was Rescue Pets Iowa's sole employee and member.

24.     Rescue Pets Iowa was a corporate shell. Its only purpose was to serve as a conduit through which J.A.K.'s funneled the legal title of commercially bred dogs so that they could be labeled as "rescues" before reaching consumers in California.

25.     Rescue Pets Iowa was a defendant in the Iowa AG lawsuit. Rescue Pets Iowa was located in Ottumwa, Iowa at the same address as Kirk's personal residence.

26.     Defendants Kirk and Rescue Pets Iowa are collectively referred to as "Rescue Pets Iowa."

27.     Kirk is also a member of TBHF LLC d/b/a The Pet X Change, an Iowa limited liability company ("TBHF LLC").

28.     While Defendant TBHF LLC purports to be in the business of "software development and services," it played an active role in Defendants' illicit puppy laundering scheme. TBHF LLC created the documents that Defendants relied upon to disguise their scheme and paid for the Certificates of Veterinary Inspections that were required to transfer the fake rescue puppies from Iowa to California.

29.     TBHF LLC is located in Britt, Iowa, at the same address as Defendant Noethe's personal residence.

30.     Defendant Bark Adoptions is a California corporation, California Corporate Number C4215365, located in Menifee, California. Bark Adoptions was formed in November of 2018, also shortly before California's ban on the sale of commercially bred puppies went into effect on January 1, 2019.

31.     Defendant Stephanie Vaughn is Vice President of Bark Adoptions. She is a resident of Winchester, California.

32.     Defendant Ana Diaz is President of Bark Adoptions. She resides in Menifee, California at the same address as Bark Adoptions. She is the sister of Amilcar Chavez, a California pet store owner and operator who regularly sold weeks-old puppies to California consumers after California's ban on the sale of commercially bred puppies went into effect on January 1, 2019.

33. Bark Adoptions is a corporate shell. It is a conduit through which Defendants funneled the legal title of commercially bred dogs so that they can be labeled as "rescues" before reaching consumers in California.

34. Defendants Vaughn, Diaz and Bark Adoptions are collectively referred to as "Bark Adoptions."

35. Defendant Pet Connect Rescue, Inc. ("Pet Connect Rescue") is a Missouri-based sham animal rescue organization incorporated under Missouri law on January 26, 2018. Pet Connect Rescue has acquired hundreds to thousands of dogs from J.A.K.'s and other puppy mill sources and, knowing the dogs' puppy mill origins, transferred the dogs to California pet stores for compensation, in violation of the Puppy Mill Ban.

36. Defendants Ray Rothman and Alysia Rothman are the co-owners and co-operators of Pet Connect Rescue. Both Ray and Alysia Rothman are residents of Missouri.

37. Defendants Alysia and Ray Rothman and Pet Connect Rescue are collectively referred to as "Pet Connect Rescue."

38. Defendants Rescue Pets Iowa, Bark Adoptions, and Pet Connect Rescue are collectively referred to as the "Sham Rescues."

***Interstate Transporter Defendants.***

39. Defendant Subject Enterprise, Inc. is an entity organized under the laws of Iowa located at 165 – 210th Street, Wesley, Iowa 50483 and incorporated in June 2018. Subject Enterprise, Inc. is a transportation company that exclusively serves J.A.K.'s and ships J.A.K.'s puppies into California for sale to pet stores. Subject Enterprise, Inc. is registered as a Class T – Carrier with the United States Department of Agriculture.

40. Defendant Coda Subject is the Director of Subject Enterprise, Inc. He is the nephew of Defendant Jolyn Noethe. He is a resident of Iowa.

41.     Defendants Coda Subject and Subject Enterprise, Inc. are collectively referred to as "Subject Enterprise."

***Pet Store Defendants.***

42.     Defendant Micada, Inc. d/b/a Animal Kingdom Pet Shop ("Micada" or "Animal Kingdom") was a California corporation operating at least three retail pet stores during the relevant time: (1) 1675 West Grand Avenue in Grover Beach and (2) 651 Dolliver Street in Pismo Beach, both located in the County of San Luis Obispo; and (3) 142 Town Center East in Santa Maria, located in the County of Santa Barbara. Animal Kingdom repeatedly violated the Puppy Mill Ban by acquiring from one or more of the other Defendants hundreds of puppies and then selling them through its pet stores after the Puppy Mill Ban went into effect.

43.     Defendant Adam Tipton was the owner of Animal Kingdom. Tipton is a resident of California.

44.     Defendant Animal Kingdom, Defendant Tipton and any and all pet stores operated by Animal Kingdom are collectively referred to as "Animal Kingdom."

## FACTUAL ALLEGATIONS

### I.     The California Puppy Mill Ban.

45.     On January 1, 2019, California's ban on the sale of animals sourced from large scale commercial breeders—puppy mills—came into effect. Cal. Health & Safety Code § 122354.5 ("Puppy Mill Ban").

46.     The Puppy Mill Ban requires that pet stores only sell dogs from rescue groups or animal shelters:

> A pet store operator shall not sell a live dog, cat, or rabbit in a pet store unless the animal was obtained from a public animal control agency or shelter, society for the prevention of cruelty to animals shelter, humane society shelter, or rescue group that is in a cooperative agreement with at least one private or public shelter . . . .
> *See* Health & Safety Code § 122354.5(a).

47.     A "rescue group" is defined as "an organization that is tax exempt under Section 501(c)(3) of the Internal Revenue Code, and that does not obtain animals from breeders or brokers for compensation." *See* Health & Safety Code § 122354.5(j).

48.     "Rescue group" does not include puppy mills. A "puppy mill" has been defined as a "dog breeding operation in which the health of the dogs is disregarded in order to maintain a low overhead and maximize profits." *Avensen v. Zegart*, 577 F. Supp. 958, 960 (D. Minn. 1984).

49.     When enacting the Puppy Mill Ban, the California Assembly and Senate referred to "puppy mills" as a "common term[] for large commercial breeding facilities that mass produce animals for sale at retail markets," and expressed concerns for the health and welfare of dogs at such facilities. A.B. 485, Senate Floor Analyses at 3 (Ca, Sept. 9, 2017); A.B. 485, Assemb. Floor Analyses at 3 (Ca, Sept. 13, 2017).

50.     The standard practice for puppy mills involves keeping mother dogs in cages that are only six inches longer than their bodies for their entire life, with no requirement that they ever leave them. Dozens to hundreds of mother dogs are stacked in rows and columns of cages, covered in waste and exposed to the elements, without protection from the heat or cold. These mother dogs give birth to several litters of puppies a year, with no limit on the number of times they can be forced to breed. The puppies are taken away from the mother when they are six to eight weeks old and transported long distances to retail pet stores. Many die en route or face a shortened life from illness and disease from the mills' unsanitary and overcrowded facilities, or inbreeding.

51.     Passed on October 13, 2017, the Puppy Mill Ban was meant to eliminate the supply of puppies from facilities that "are typically operated with an emphasis on profits over animal welfare," wherein "dogs often live in substandard conditions, housed for their entire reproductive lives in cages or runs, provided little to no positive human interaction or other forms of environmental enrichment, and minimal to no veterinary care." *See* A.B. 485, Senate Floor Analyses at 3 (Ca, Sept. 9, 2017). The

California legislature anticipated that consumers' demand for puppies would readily be met by "the availability of shelter animals in California as a source for either adoption or for sale in a pet store establishment." *Id.*

52.     Transitioning away from the puppy mill industry has both animal welfare and consumer protection goals. As the Iowa Attorney General's Office explained in its complaint in the Iowa AG lawsuit, consumers "choose not to buy puppies originating from [puppy mills]," in part because "consumers who purchase expensive puppies bred within a puppy mill are less assured that the dogs will live average lifespans, since puppy mill breeding operations often result in illnesses that reduce the quality and length of puppies' lives." *See State of Iowa v. Hobo K9 Rescue et al.*, Pet No. 05771 EQCE084294 at 3 (filed Mar. 18, 2019).

## II.     Embedded Puppy Mill Industry Players Scheme to Circumvent the Chicago Ban on Puppy Mill Sales.

53.     California's Puppy Mill Ban is not unique. Like California, numerous counties, states, and municipalities have met consumer concerns with the sale of puppy mill animals by restricting or banning the sale of commercially bred animals outright.

54.     In 2014, Chicago enacted its own ban prohibiting the sale of dogs that were not obtained from a rescue organization. *See* CHI, ILL., LOCAL ORDINANCES ch. 4 § 384-015(b).

55.     To circumvent Chicago's ban, J.A.K.'s—one of the country's largest puppy mill brokers—resorted to "puppy laundering," or "the purposeful masking of the genuine source of merchandise puppies from consumers and law enforcement." *State of Iowa v. Hobo K9 Rescue et al.*, Pet No. 05771 EQCE084294 at 4 (hereinafter "Iowa AG Petition"), *available at* https://www.iowaattorneygeneral.gov/media/cms/hobo_k9_final_petition_F741B0336 3499.pdf. J.A.K.'s funneled the commercially bred puppies' legal title through Hobo K-9 Rescue ("Hobo K-9), an Iowa-based sham non-profit "rescue" operated by

-11-

Defendants Noethe and Dolphin. By funneling the puppies through a sham rescue of its own creation, J.A.K.'s was able to mischaracterize them as genuine "rescues" before delivering them to Chicago, and thereby "frustrate and circumvent laws protecting consumers – for profit." *Id*. at ¶ 57.

56.    J.A.K.'s used Hobo K-9 to sell almost 1,300 puppies, almost all of whom entered Chicago and other banned jurisdictions under the pretense of having been "rescued" from none other than J.A.K.'s. *See id*. at ¶¶ 27-29.

57.    Unlike genuine rescues, the sales had hallmarks of the for-profit puppy mill industry. Hobo K-9 provided pedigrees with the sale of each puppy, transferred most of the animals to for-profit pet stores who sold them to consumers for nearly $4,000 each, and did not spay or neuter the eight- to ten-week old puppies. *Id*. at ¶¶ 31-33.

58.    J.A.K.'s benefited significantly from the Chicago scheme. It received substantial sums for the puppies, through payments that Hobo K-9 received from Chicago pet stores and marked for transfer to J.A.K.'s as "procurement fees." Hobo K-9 transferred more than $710,000 of Chicago pet store payments to J.A.K.'s. *See id*. at ¶¶ 34, 39-41.

59.    On March 18, 2019, the Iowa Attorney General exposed the Chicago scheme, lodging a formal complaint against J.A.K.'s, Defendant Noethe, and Defendant Dolphin, alleging they were "integral actors of a national puppy laundering ring emanating from within Iowa." Iowa AG Petition at ¶ 16.

60.    But the Iowa Attorney General's investigation and enforcement did not deter J.A.K.'s. Instead, it moved quickly "to obscure ongoing fraudulent activities the Attorney General ha[d] been investigating since June 2018 by creating a brand-new sham charity called Rescue Pets Iowa Corp." *Id*. ¶ 61.

**III.    Defendants Devise New Scheme and Shell Companies to Deceive California Consumers.**

61.    With the Chicago scheme unraveling, and with Rescue Pets Iowa poised to continue rebranding J.A.K.'s puppy mill animals as fake rescues, J.A.K.'s and its associates refocused their attention to a California-based distribution ring that it had been exploiting for years.

62.    Since at least July 2017, J.A.K.'s had been using Hobo K-9 to launder hundreds of puppies to pet stores throughout California, including to those owned by pet store moguls Amilcar Chavez and David Salinas. At the time of those transfers, California was home to approximately thirty-six municipal and county-level bans on the sale of commercially bred animals. J.A.K.'s, acting in concert with its associates, knowingly laundered puppies into California through Hobo K-9 to purposefully evade those bans and to deceive consumers into believing they were buying genuine rescues.

63.    But when the Iowa Attorney General disrupted its ability to use Hobo K-9 for puppy laundering, and with the January 1, 2019 effective date of California's Puppy Mill Ban looming, J.A.K.'s and its associates recognized that they needed to establish a more elaborate network of sham rescues to perpetuate their profit-making deception in California.

64.    J.A.K.'s devised and coordinated the new scheme, consisting of new sham organizations and associates, at least six months before the Puppy Mill Ban went into effect on January 1, 2019. Defendants knowingly and intentionally worked in concert with each other and concocted at least two sham rescue organizations, a transport company, and a new payment and documentation system for the purpose of funneling puppy mill dogs disguised as rescues into California for the common purpose of profiting from their illegal sale.



### i. J.A.K.'s Acquires Puppies from Usual Roster of Commercial Breeders.

65.     J.A.K.'s first step, as the broker of the elaborate puppy laundering scheme, was to acquire puppies from its usual roster of commercial breeders, *i.e.*, puppy mills, to transfer into California as purported "rescues."

66.     The breeders whose dogs J.A.K.'s selected to launder into California operate some of the worst facilities in the country. One such for-profit breeder is Amos Schwartz, who in 2013 was in the Humane Society of the United States' "Horrible Hundred" list of the worst puppy mills in the United States. According to

the Humane Society, the dogs held at his facility have been documented as underweight and left "shivering in the cold" with "open wounds."

67.    Another example is AJ's Angels Inc. AJ's Angels houses approximately 400 dogs at a time, who have been observed to exhibit neurotic behavioral patterns due to their inadequate enclosures. Pictures of AJ's Angels' breeding dogs are included below.





### ii. **J.A.K.'s Coordinates with Its Associates to Launder Puppies through a Sham Non-Profit.**

68.     After acquiring dogs from puppy mills, J.A.K.'s funneled the dogs' legal title through a sham non-profit which it helped create to enable other participants in the scheme to falsely label the puppy mill animals as "rescues."

69.     To disguise its involvement with a sham rescue of its own making, J.A.K.'s colluded with Defendant Noethe's and Defendant Dolphin's close friends and associates to outsource the "rescue" of the puppy mill dogs whom J.A.K.'s brokers.

70.     One such associate was Defendant Russell Kirk, who, colluding with J.A.K.'s, willingly and knowingly agreed to become the owner and operator of the new sham rescue, Rescue Pets Iowa. Rescue Pets Iowa began operating in November 2018, just weeks before the Puppy Mill Ban went into effect.

71.     At all material times, Rescue Pets Iowa functioned solely as a rescue on paper. It never took physical custody of an animal it purported to rescue. It did not send anyone to visit J.A.K.'s to view the puppies as a matter of course. And it did not otherwise interact with the puppies it was "rescuing."

72.     Defendants J.A.K.'s and Defendant Kirk used Defendant Rescue Pets Iowa as a vehicle to deceptively rebrand puppy mill animals as fake "rescues" in order to circumvent consumer protection laws in various jurisdictions and even transferred the puppies from Rescue Pets Iowa on to other sham rescues prior to eventual sale in pet stores. The scheme was designed to supplant and improve upon the Chicago laundering ring by funneling puppies through multiple levels of sham non-profits across states. Indeed, Defendants JAK's and Kirk created an elaborate vertical scheme whereby each of the necessary steps in the puppy laundering—purchase from puppy mills, rebranding of puppies as rescues, transport of such rebranded puppies, and sale of such puppies to consumers through pet stores—was perpetrated by knowing co-conspirators/associates. The reasons for doing so were three-fold: the deception and process could be controlled by Defendants, profits would be maximized in a

jurisdiction otherwise off-limits to Defendants because of the Puppy Mill Ban, and the chances of being caught through the elaborate structure would be minimized.

73. While J.A.K.'s took a lead role in coordinating the puppy acquisition from private breeders, transfer of ownership to Rescue Pets Iowa, and distribution to California pet stores process—*i.e.*, the puppy laundering—J.A.K.'s associates, including each Defendant, knowingly and willingly played their role in concert with each other and with the common purpose of achieving the integrated scheme.

74. J.A.K.'s identified the amount and type of puppies to "send" to Rescue Pets Iowa each week for "rescue." As shown through emails exchanged with J.A.K.'s for each batch of commercially bred puppies, Rescue Pets Iowa willingly accepted and facilitated these paper transfers. Each animal "rescued" by Rescue Pets Iowa came solely from J.A.K.'s.

75. J.A.K.'s, with the active assistance of Defendants Kirk and TBHF LLC, arranged the puppies' veterinary inspection and care prior to transport to another out-of-state "rescue."

76. J.A.K.'s also retained physical control over the puppies selected for "rescue." The dogs never left J.A.K.'s facility until a transport company, Defendant Subject Enterprise, arrived to deliver them out of state.

77. Indeed, many of the Certificates of Veterinary Inspection required for interstate transport of each shipment of puppies purportedly sent from Rescue Pets Iowa to California were signed by Jolyn Noethe, even though she had no official role in the operation of Rescue Pets Iowa. This was done with Rescue Pets Iowa's knowledge and acquiescence.

78. In March 2019, a California corporation named Volar Society for the Prevention of Cruelty to Animals and the non-profit Bailing Out Benji sued Defendants Rescue Pets Iowa and Russell Kirk over their illegal, fraudulent sales of puppy mill puppies in violation of Cal. Health & Safety Code § 122354 ("Volar Lawsuit"). In settling that lawsuit on October 6, 2021, Kirk agreed to refrain from re-

organizing Rescue Pets Iowa or any other non-profit animal rescue organization and agreed with Rescue Pets Iowa to refrain from acquiring, selling, or supplying any dogs to Bark Adoptions, non-profits, animal rescue organizations, or pet stores in California.

79.    Similarly, as a condition of the resolution of the Iowa AG lawsuit, Rescue Pets Iowa Corp. was forced to dissolve, which it did in October 2019.

80.    If it had not been caught and sued, Rescue Pets Iowa Corp. would have continued its fraudulent, illegal activities. Indeed, its principal, Defendant Kirk, continued to participate in the puppy laundering scheme after the corporation was dissolved.

81.    Defendant Kirk's involvement in the puppy laundering ring continued through his operation of Defendant TBHF LLC, an Iowa limited liability company serving the pet trade industry. Defendant Kirk runs TBHF LLC with his brother, who is also Defendant Noethe's romantic partner.

82.    Defendants J.A.K.'s, Kirk, Rescue Pets Iowa , and TBHF LLC coordinated to create invoices and meet USDA reporting requirements for the shipment and sale of puppies, which allowed them to track groups of puppies acquired by J.A.K.'s from purchase, to delivery, to their final destinations.

83.    For example, Defendant TBHF LLC created documents tracking which dogs from what commercial breeders would be transferred to Defendant Rescue Pets Iowa; documents noting the breed and sex of dogs to enable the California pet stores to select which to order; and documents facilitating the transport of the dogs into California. TBHF LLC also paid for the veterinary inspections associated with the Certificates of Veterinary Inspection needed for the puppies' interstate transport from Rescue Pets Iowa to California.

84.    Defendants J.A.K.'s, Kirk, Rescue Pets Iowa, and TBHF LLC had worked together before in laundering puppies in attempts to circumvent puppy mill bans and deceive consumers. Years earlier, TBHF LLC played a similar role when it

facilitated the laundering of puppies through Hobo K-9 Rescue into Chicago and California, among other markets.

### iii.    J.A.K.'s, Kirk, and Rescue Pets Iowa Arrange the Transport of Puppies to California.

85.    As part of laundering the puppies through Defendant Rescue Pets Iowa, Defendants J.A.K.'s, Kirk, and TBHF LLC arranged for the transport of animals to California. They coordinated with Defendant Subject Enterprise (Noethe's nephew, Defendant Coda Subject, and his transport company, Subject Enterprise, Inc.) to pick up the animals from J.A.K.'s facility and truck them to California.

86.    Subject Enterprise, Inc., the transportation company created by Defendant Coda Subject, was incorporated on June 1, 2018, six months before the Puppy Mill Ban's effective date. Subject Enterprise began shipping puppies for J.A.K.'s that year, including into California.

87.    Subject Enterprise is intimately linked with J.A.K.'s. Subject Enterprise used vehicles it acquired from J.A.K.'s weeks after incorporating and finances its business operations with loans guaranteed by Defendants Noethe and Dolphin. Subject Enterprise primarily (if not exclusively) transported puppies brokered by Defendant J.A.K.'s. In addition to transporting the puppies, Subject Enterprise played an essential role in the scheme by collecting, concealing, and distributing funds among Defendants and co-conspirators, as further described below.

### iv.    J.A.K.'s, Kirk, Rescue Pets Iowa, and Subject Enterprise Launder the Puppies through a Second Sham Non-Profit.

88.    After laundering the puppies' legal title through Rescue Pets Iowa, J.A.K.'s arranged for Subject Enterprise to take them to Bark Adoptions, a sham nonprofit in California.

89.    Defendant Bark Adoptions was a key thoroughfare in California for J.A.K.'s eventual sales in California pet stores. Defendants Stephanie Vaughn and Ana Diaz formed Bark Adoptions in November 2018. Defendant Vaughn met

Defendant Kirk while visiting family in Iowa, and thereafter served as the point person for Rescue Pets Iowa. She handled all communications with Defendant Kirk for the placement of "rescued" animals sourced from private breeders through J.A.K.'s. Defendant Vaughn even chose which California pet stores to send the puppies to.

90.     Like Rescue Pets Iowa, Bark Adoptions functioned as a paper waystation so that the puppies from J.A.K.'s' distribution for ultimate sale could receive the veneer of a nonprofit "that does not obtain animals from breeders or brokers for compensation," Cal. Health & Safety Code § 122354.5(j), without ever obtaining physical custody of the puppies.

91.     Though stylized as a rescue, Bark Adoptions never fostered puppies. It never had an individual human adopter rescue one of its puppies, and stated it was "not open to the public."

92.     Bark Adoptions only rescued approximately five dogs from a source providing true homeless or unwanted animals *in total*. On information and belief, Bark Adoptions intended to use these few bona fide rescues as a front to help conceal the sham nature of its operation.

93.     Bark Adoptions' primary purpose was not to serve as a rescue of homeless animals, but to help launder and facilitate the sale of J.A.K.'s puppy mill puppies in California pet stores.

94.     Bark Adoptions was compensated for performing its role in Defendants' California puppy laundering scheme. Bark Adoptions received substantial payments for each puppy it "rescued" from J.A.K.'s, despite having little to no overhead and almost no custody or care over the puppies sent briefly to its physical location.

95.     The San Diego Humane Society and San Luis Obispo County Animal Services conducted investigations in early 2019 which identified Bark Adoptions' prominent role in the puppy laundering scheme. The investigations cite Certificates of Veterinary Inspection that show nearly all the dogs supplied by Bark Adoptions to

California pet stores were purebred or designer puppies less than three months old. *See, e.g.*, https://www.youtube.com/watch?v=iTIj9T3Ic14&app=desktop; https://ksby.com/news/ksby-investigates/2019/02/28/closing-the-pet-shop-loophole. To those familiar with the puppy mill industry, these characteristics suggested the puppies were not "rescues" but in fact from puppy mill breeders' and brokers' regular inventory.

96.   When investigations into Bark Adoptions' role in the sale of puppy mill animals in California began in early 2019, J.A.K.'s and Defendant Kirk apparently sought cover by diverting a portion of their puppy laundering to Defendant Pet Connect Rescue.

97.   Based in Joplin, Missouri, Pet Connect Rescue was founded in January 2018 by Defendants Ray and Alysia Rothman, previous pet store owners who had acquired puppies directly from J.A.K.'s for sale in their Connecticut store.

98.   Pet Connect Rescue functioned as an additional or alternative sham rescue through which J.A.K.'s,' Rescue Pets Iowa, and Defendant Kirk would ship J.A.K.'s puppies into California.

99.   Pet Connect Rescue assumed a more prominent role in the California laundering scheme after Bark Adoptions asked Defendant Ray Rothman, Pet Connect Rescue's operator, to ship puppies to California pet stores in early 2019.

100.   Rescue Pets Iowa, through Defendant Kirk, contacted Defendant Ray Rothman by telephone and electronic mail to offer J.A.K.'s' puppies as a source of these so-called rescues.

101.   Pet Connect Rescue merely served as another layer of a sham rescue to conceal the true origin of J.A.K.'s puppies. Pet Connect Rescue did not host adoption events or provide any other rescue services to the puppies sent from J.A.K.'s through Rescue Pets Iowa, things which real rescues typically perform.

102.   Like Bark Adoptions, Pet Connect Rescue never took physical custody of the puppies it received from J.A.K.'s through Rescue Pets Iowa. In fact, it could not

take physical custody because Pet Connect Rescue existed solely on paper, with no physical location.

103.    Rather, after receiving the legal title to J.A.K.'s puppies, Pet Connect Rescue sold the puppies to California pet stores including Defendant Animal Kingdom, arranging for delivery through Defendant Subject Enterprise.

**v.    At the Direction of J.A.K.'s and With the Aid of Other Defendants, Sham Rescue Defendants Funnel Commercially Bred Puppies to California Pet Stores.**

104.    Using the elaborate, carefully crafted puppy laundering scheme described above, J.A.K.'s and its co-defendants exported "bunches of pure and designer breeds" into California, "apparently replicating the same puppy laundering activities as [] Hobo K-9 Rescue." Iowa AG Petition at ¶ 64.

105.    From November 30, 2018, through September 9, 2019, J.A.K.'s, through and with each's knowledge of the puppy laundering scheme and in concert with each other, Subject Enterprise, TBHF LLC, Rescue Pets Iowa, and Pet Connect Rescue, sent more than 2,000 puppies to pet stores in California, either directly or by way of Bark Adoptions.

106.    In February and March 2019, for example, Pet Connect Rescue "received" approximately 170 animals in four shipments labeled as coming from Rescue Pets Iowa, but in reality sourced from commercial breeders and puppy mills by J.A.K.'s. Pet Connect Rescue then funneled these puppies for sale in California pet stores, including at Defendant Animal Kingdom's stores.

107.    Pet Connect Rescue had substantial business funneling puppies into California. In 2019 and 2020, it laundered 8-to-12-week-old puppies from commercial breeders to California pet stores on a weekly basis.

108.    Bark Adoptions first acquired puppies funneled from J.A.K.'s through Rescue Pets Iowa on November 30, 2018, when it acted as a brief waystation for 57 puppies delivered from Iowa by Subject Enterprise. Deliveries occurred on at least

three different occasions prior to 2019, ensuring that pet stores would have purported "rescues" in stock on the Puppy Mill Ban's effective date.

109.   J.A.K.'s always directed each act of puppy laundering, with each of the Defendants, its associates, knowingly and willfully performing their part in the elaborate scheme. For example, from at least January 6, 2019, until April 28, 2019, Defendant Noethe, through J.A.K.'s' email account, sent 13 emails to Defendant Kirk in his role at Defendant Rescue Pets Iowa requesting placement of puppies for "rescue," to which Kirk would signal his consent/agreement to place such puppies.

110.   Rescue Pets Iowa, in turn, emailed Defendant Bark Adoptions at J.A.K.'s' behest to communicate how many puppies J.A.K.'s had selected to send there. The emails—which were the only "rescuing" Rescue Pets Iowa did for J.A.K.'s' puppies—completed Rescue Pets Iowa's role as a conduit through which the dogs' legal title passed so that they could be labeled as "rescues" before they reached consumers in California.

111.   In exchange for these services, Rescue Pets Iowa received, at minimum, compensation through the other Defendants' paid use of TBHF LLC to generate the invoices and documentation necessary to track—and disguise—the puppies' shipment and sale, specifically Defendants J.A.K.'s, Rescue Pets Iowa, Subject Enterprise, Bark Adoptions, Pet Connect Rescue, and Animal Kingdom. The use of TBHF LLC by these Defendants generated income for TBHF LLC.

112.   TBHF LLC was paid in part on a per-dog basis. The more puppies it helped to launder into California, the more money it received from the other members of the scheme. Upon information and belief, Defendant Kirk used the money that he received from his involvement in TBHF LLC to pay for Rescue Pets Iowa's operational costs, which were necessary to maintain its appearance of legitimacy and, thereby, promote Defendants' scheme.

113.   From November 30, 2018, until September 2019, Bark Adoptions received weekly shipments of 30–119 puppies from J.A.K.'s through Rescue Pets

Iowa. Bark Adoptions never turned away animals that J.A.K.'s sent to California via Rescue Pets Iowa.

114.   From November 30, 2018 until at least September 2019, Subject Enterprise transported each shipment of puppies to Bark Adoptions.

115.   Each of these shipments were grueling, 30+ hour affairs for the weeks-old puppies transported from Iowa to California.

116.   Puppies did not survive the trip. According to Subject Enterprise notes, a chihuahua was "dropped and died," another "puppy died on west coast truck," and a pet store refused to pay for a puppy who "died in transit." In addition, when a puppy passed away, Subject Enterprise would note the financial loss for J.A.K.'s.

117.   For J.A.K.'s, Subject Enterprise, and the Sham Rescues, the puppies' deaths were a routine cost of doing business.

118.   For the puppies who survived the journey to Bark Adoptions, the trip was not complete. Upon arrival in California, each shipment of puppies from J.A.K.'s and Rescue Pets Iowa and/or Pet Connect Rescue spent two to three hours at Bark Adoption's physical location—a garage operated out of Defendant Diaz's home outfitted with 20 piled dog cages. Less than one percent of puppies brought to Bark Adoptions stayed longer than 24 hours before being redirected to pet stores.

119.   Each shipment of puppies would be transported from Bark Adoptions by Subject Enterprise in the same vehicle it arrived in and taken to California pet stores for sale.

120.   Defendants continued to direct shipments of puppies from the Midwest to California into 2020. Documents obtained from the State of Iowa show that in January 2020, J.A.K.'s trucked eight eight-week-old designer breed puppies to an animal dealer based in Jamul, California. In addition, volunteers tracking the shipment of puppies to Southern California puppy stores obtained evidence that Pet Connect Rescue transferred puppies to a pet store in Santee, California, in May 2020.

**IV.    California Pet Stores Display the Puppies as "Rescues."**

121.   Defendants Bark Adoptions and Pet Connect Rescue funneled the puppies acquired by J.A.K.'s to various pet stores in California, including Defendant Animal Kingdom's pet stores.

**i.    Defendant Animal Kingdom's Fraudulent Sales.**

122.   Defendant Animal Kingdom operated at least three retail pet stores in California during J.A.K.'s' establishment of a puppy laundering ring.

123.   For years, Defendant Animal Kingdom relied on puppy mill brokers like J.A.K.'s to supply the puppies it sold in pet stores. When the Puppy Mill Ban was being considered by the California legislature, Animal Kingdom owner Defendant Adam Tipton decided to join forces with David Salinas to fight against the proposed bill. Both pet store owners contributed to lobbying efforts against the bill so they could maintain their business model.

124.   After the law passed, Animal Kingdom knowingly and intentionally agreed to conspire with J.A.K.'s and the other Defendants to circumvent the puppy mill ban and joined J.A.K.'s' puppy laundering scheme so that it could continue to profit from the sale of weeks-old puppies.

125.   In 2019, Animal Kingdom was a defendant in the Volar Lawsuit, concerning its illegal, fraudulent sales of puppy mill puppies in violation of the Puppy Mill Ban. In settling the Volar Lawsuit, Animal Kingdom agreed to cease acquiring animals from Bark Adoptions, Rescue Pets Iowa, and J.A.K.'s—among others—and to comply with the Puppy Mill Ban. Had Animal Kingdom not been sued, it would have continued its illegal puppy laundering activities.

**ii.  Salinas Pet Stores' Fraudulent Sales.**

126.   Defendants Bark Adoptions and Pet Connect Rescue also funneled the puppies acquired by J.A.K.'s to stores associated with David Salinas. Salinas is a Utah resident and a pet store mogul who owns and operates pet stores in California including Broadway Puppies, The Fancy Puppy, Hello Puppies, Pups & Pets, and

National City Puppy. Salinas repeatedly violated the Puppy Mill Ban by sourcing puppies from puppy mills through J.A.K.s,' Rescue Pets Iowa, and Pet Connect Rescue for sale in California pet stores owned by him or companies he owns or manages, including The Puppy Store LLC and Yellow Store Enterprises, LLC.

127.   Salinas also operates SoCal Puppy Adoptions, Inc. ("SoCal Puppy"). SoCal Puppy is a nonprofit organization organized in California on January 9, 2019, to "[f]ind permanent suitable new homes for stray, abandoned, and surrendered dogs." SoCal Puppy has shared the same address as Salinas's pet stores Pups & Pets, located at 50 Town Center Parkway, Santee CA 92071, and National City Puppy, located at 1430 East Plaza Blvd., Suite E20, National City, CA 91950. SoCal Puppy repeatedly violated the Puppy Mill Ban by acquiring from one or more of the Defendants hundreds of puppies and then selling them through Salinas's pet stores after the Puppy Mill Ban went into effect.

128.   The California stores Broadway Puppies, The Fancy Puppy, Hello Puppies, Pups & Pets, and National City Puppy, together with The Puppy Store, LLC, SoCal Puppy, and Yellow Store Enterprises, LLC, are hereinafter referred to as the "Salinas Pet Stores."

129.   The Salinas Pet Stores also acquired puppies from J.A.K.'s through Defendants Rescue Pets Iowa, Bark Adoptions, and Pet Connect Rescue during 2019 through at least May 2020.

130.   Each of the Salinas Pet Stores also sold puppies from Pet Connect Rescue in 2019 and 2020.

131.   Richard Robles Pena, the General Manager in charge of acquiring puppies for the Salinas Pet Stores, testified that during 2019 the California stores sometimes obtained their puppies from Pet Connect Rescue.

132.   In mid-2020, several of the Salinas Pet Stores were cited by local authorities for violating the Puppy Mill Ban and/or enjoined by state courts from continuing their illegal sales. Shortly thereafter, these stores shut down. Had they not

been caught and shut down, the Salinas Pet Stores would have continued illegal, fraudulent sales in violation of the Puppy Mill Ban.

### iii. The Chavez Pet Stores' Fraudulent Sales.

133.   Another pet store chain coordinating with Defendants Bark Adoptions and other Defendants in the puppy laundering scheme was owned and operated by Amilcar Chavez.

134.   Amilcar Chavez is the former Manager and operator of Bark Avenue and Bark Boutique, two California pet stores that sold weeks-old puppies. He is a brother of Defendant Ana Diaz, the President of Bark Adoptions. Chavez repeatedly violated the Puppy Mill Ban by sourcing dogs from puppy mills through J.A.K.s' and Rescue Pets Iowa for sale in his California pet stores. He is a resident of California.

135.   Jasmin Ramirez, former Manager at Bark Avenue and Bark Boutique, likewise repeatedly violated the Puppy Mill Ban by sourcing puppies from puppy mills through J.A.K.s' and Rescue Pets Iowa for sale in the pet stores.

136.   Bark Avenue Pets, LLC ("Bark Avenue") was a limited liability company located at 200 East Via Rancho Parkway, Escondido, California, 92025, the same address as Bark Avenue, the California pet store and sham rescue owned and operated by Chavez and Ramirez through Bark Avenue Pets, LLC and various other shell entities. The company formed on December 22, 2018, days before the Puppy Mill Ban went into effect. Ramirez was a member of Bark Avenue Pets, LLC. Upon information and belief, Bark Avenue Pets, LLC repeatedly violated the Puppy Mill Ban by acquiring from one or more of the other Defendants hundreds of puppies and then selling them through its pet stores after the Puppy Mill Ban went into effect.

137.   Escondido Pets, LLC was a limited liability company located at 200 East Via Rancho Parkway, Escondido, California, 92025, the same address as Bark Avenue, the California pet store and sham rescue owned and operated by Chavez and Ramirez through Escondido Pets, LLC and various other shell entities. Chavez was the sole manager listed for Escondido Pets. Escondido Pets listed its business as a

"[p]et store offering puppies and kittens for sale." Escondido Pets repeatedly violated the Puppy Mill Ban by acquiring hundreds of puppies from one of more Defendants and then selling them through its pet stores after the Puppy Mill Ban went into effect.

138.   Bark Boutique & Rescue, LLC ("Bark Boutique") was a California limited liability company incorporated in February 2018 and registered at 40820 Winchester Rd. #2320, Temecula, CA 92591, the same address as Bark Boutique, the California pet store and sham rescue owned and operated by Chavez and Ramirez through Bark Boutique and various other shell entities. Ramirez and Chavez are listed as Bark Boutique's only managers or members. Bark Boutique's purpose was listed as "Pet store & rescue." Bark Boutique repeatedly violated the Puppy Mill Ban by acquiring hundreds of puppies from one or more Defendants and then selling them through its pet stores after the Puppy Mill Ban went into effect.

139.   Amilcar Chavez, Jazmin Ramirez, Bark Avenue, Escondido Pets, Bark Boutique, and any and all pet stores operated by the same are collectively referred to as "Chavez Pet Stores."

140.   The Chavez Pet Stores had done previous business with J.A.K.'s.

141.   The Chavez Pet Stores each acquired puppies from J.A.K.'s through Defendants Rescue Pets Iowa and Bark Adoptions during 2019. Puppies marketed as coming from "Bark Adoptions" were being sold as late as December 2019 in at least one Chavez Pet Store.

142.   In December 2019, a California state court enjoined the Chavez Pet Stores from continuing illegal sales. Soon after, the stores shut down. Had they not been caught, the Chavez Pet Stores would have continued illegal, fraudulent sales in violation of the Puppy Mill Ban.

### iv. Puppies 4 Less's Fraudulent Sales.

143.   Puppies 4 Less was yet another pet store that took advantage of the supply chain of puppy-mill animals sourced from J.A.K.'s following the Puppy Mill Ban.

1    144.   Puppies 4 Less was a California corporation, owned and operated by

2    Anita Chavira, that operated a pet store in Temecula, Riverside County at 31285

3    Temecula Parkway, Suite 180. Puppies 4 Less and Chavira (collectively, "Puppies 4

4    Less") repeatedly violated the Puppy Mill Ban by acquiring from one or more of the

5    other Defendants hundreds of puppies and then selling them through its pet stores

6    after the Puppy Mill Ban went into effect.

7    145.   On June 12, 2020, a state court issued a temporary injunction barring

8    Puppies 4 Less from continuing illegal sales "in violation of Health & Safety Code

9    Section 122354.5." Soon after, the store permanently shut down. Had they not been

10   caught and shut down, Puppies 4 Less would have continued its illegal, fraudulent

11   sales in violation of the Puppy Mill Ban.

12   **v.   The Pet Stores Uniformly Misrepresented the Puppy Mill Dogs as**

13   **Rescues**

14   146.   Defendant Animal Kingdom along with the Salinas Pet Stores, the

15   Chavez Pet Stores, and Puppies 4 Less are collectively referred to as the "Pet Stores."

16   147.   Each of the Pet Stores held out the pure and designer bred puppies they

17   ordered from J.A.K.'s as "rescues" coming from Defendant Bark Adoptions or

18   Defendant Pet Connect Rescue.

19   148.   Cage cards displayed in the Pet Stores in 2019 and 2020 show puppies

20   coming from "Bark Adoptions Rescue, CA," and "PetConnect Rescue, Joplin, MO" or

21   "Rescue Org: Pet Connect, Joplin, Missouri," when in fact they came from puppy

22   mills via J.A.K.'s.

23   149.   For example, a cage card displayed in one of Defendant Animal

24   Kingdom's California pet stores prominently showed a Pembroke Welsh Corgi

25   acquired from "Bark Adoptions Rescue" with a birthdate of Nov. 27, 2018 for sale for

26   $1,999.99, and microchip number 991001001881082.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



150.    Certificates of Veterinary Inspection issued January 28, 2019, show Rescue Pets Iowa sent Bark Adoptions a Pembroke Welsh Corgi, among 88 other puppies, with the same microchip number, birthdate, and breed. Just like all puppies supposedly "rescued" by Rescue Pets Iowa, the puppy came from J.A.K.'s. J.A.K.'s sourced the dog from a puppy mill or private breeder.

151.    Similar cage cards displayed in the Pet Stores in 2019 and 2020 show puppies coming from "Pet Connect Rescue, MO," when in fact they came to Pet Connect Rescue from J.A.K.'s via Rescue Pets Iowa.

152.    For example, a cage card offering a Siberian Husky puppy for sale in one of Animal Kingdom's California pet stores for $1,599.99 listed a microchip number of 991001001874508 and a birthdate of Dec. 8, 2018.

1
2
3
4
5
6
7
8
9



10      153.   A Siberian Husky puppy with the microchip number 991001001874508
11 and a date of birth of Dec. 7, 2018, is marked on a Certificate of Veterinary Inspection
12 issued February 10, 2019, transferring puppies from Rescue Pets Iowa to Pet Connect
13 Rescue. The puppy also came from J.A.K.'s.
14      154.   As another example, in May of 2020, cage cards at Salinas's store Pups
15 & Pets in Santee, California, offered nine-week old pure-bred puppies acquired from
16 Pet Connect Rescue:



17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT – CLASS ACTION

1
2

**V.     Pet Stores Transmit Money to Bark Adoptions for J.A.K.'s Brokered Puppies.**

3      155.   Bark Adoptions asked the pet stores with whom it did business to sign
4  "Adoption Agreements."

5      156.   The Adoption Agreements required the pet stores, including Defendant
6  Animal Kingdom, to make a $65–70 contribution to Bark Adoptions in exchange for
7  each puppy they received. The money was supposed to be "immediately used to pay
8  the ongoing costs of rescuing unwanted, undesired and flawed animals," despite Bark
9  Adoptions having received nearly all of its dogs from J.A.K.'s.

10     157.   Because Bark Adoptions kept 99 percent of its rescued puppies for less
11 than 3 hours before sending them to a pet store and it operated out of Diaz's garage, it
12 profited considerably from the fees associated with each sham pet store's "adoption."

13     158.   Between December 22, 2018 and March 19, 2019, for example,
14 Defendant Animal Kingdom entered into so-called "Adoption Agreements" with Bark
15 Adoptions for the acquisition of 143 puppies. Animal Kingdom paid nearly $10,000 to
16 Bark Adoptions for the puppies funneled from J.A.K.'s in Iowa into California,
17 disguised as adoption fees and sterilization deposits.

18     159.   The Salinas Pet Stores executed at least 39 so-called "Adoption
19 Agreements" between January 8, 2019 and April 2, 2019 with Bark Adoptions for
20 over 330 puppies that came from J.A.K.'s and Rescue Pets Iowa. Each agreement for
21 a batch of puppies was signed by General Manager Richard Robles Pena.

22     160.   After April 2, 2019, the Salinas Pet Stores continued to import puppies
23 from Bark Adoptions and Rescue Pets Iowa almost weekly until at least November
24 2019.

25     161.   Almost immediately after receiving a delivery of puppies, the Salinas Pet
26 Stores would use PayPal to send thousands of dollars at a time to Bark Adoptions.

27
28

162.   The Puppy Store LLC, a Wyoming company owned by Salinas, regularly sent funds to Bark Adoptions' PayPal account that noted the payments were for Broadway Puppies, National City Puppy, Hello Puppies, and The Fancy Puppy.

163.   On April 29, 2019, for example, the same day Rescue Pets Iowa shipped 66 puppies to Bark Adoptions and a day before the Salinas Pet Stores executed adoption agreements regarding the same dogs with Bark Adoptions, The Puppy Store LLC made four PayPal payments to Bark Adoptions totaling $6,680, with a note of "National City Puppy, Hello Puppies, Broadway Puppies, and The Fancy Puppy."

164.   In total, from December 21, 2018 until July 9, 2019, The Puppy Store sent at least 41 payments to Bark Adoptions' PayPal account. The payments ranged from $100 to $6,000 per payment. The 41 payments included four payments in a two-day span, on behalf of National City Puppy, Broadway Puppies, Hello Puppies, and The Fancy Puppy, that totaled more than $20,000.

165.   Pups & Pets, a California pet store also owned by Salinas, similarly sent funds to Bark Adoptions' PayPal account.

166.   Together, the Salinas Pet Stores paid over $90,000 to Bark Adoptions for the puppies funneled from J.A.K.'s in Iowa into California from December 2018 until July 9, 2019, disguised as adoption fees and sterilization deposits and sent to Bark Adoptions' PayPal account.

167.   The Chavez Pet Stores, in turn, paid over $7,500 to Bark Adoptions for the puppies funneled from J.A.K.'s in Iowa into California, also disguised as adoption fees and sterilization deposits.

168.   The Chavez Pet Stores executed at least 39 so-called adoption agreements between January 8, 2019 and April 4, 2019 with Bark Adoptions for over 100 puppies that came from J.A.K.'s and Rescue Pets Iowa. Each agreement for a batch of puppies was signed by the same manager, Jasmin Ramirez, often on the same day.

169.   After April 4, 2019, several of the Chavez Pet Stores continued to import puppies from Bark Adoptions and Rescue Pets Iowa until December 2019 and likely for the same or similar fees it had previously paid Bark Adoptions.

170.   On information and belief, Puppies 4 Less executed adoption agreements with Bark Adoptions for at least six deliveries of puppies from J.A.K.'s and Rescue Pets Iowa.

## VI.   California Pet Stores Disguise Payments to J.A.K.'s for Commercially Bred Puppies by Routing Money Through Subject Enterprise.

171.   Before the Puppy Mill Ban, J.A.K.'s accepted payment from California pet stores through PayPal, credit card, cash, or checks made out to J.A.K.'s Puppies. However, in December 2018, with the Puppy Mill Ban looming, J.A.K.'s devised a new payment system which its associates willingly agreed to and carried out. Specifically, to disguise the payments J.A.K.'s continued to receive from pet stores and to conceal J.A.K.'s involvement in the puppy laundering scheme, the pet stores disguised their payments to J.A.K.'s as exorbitant "transport costs" paid to Subject Enterprise.

172.   The purported "transport costs" were exorbitant. Before the Puppy Mill Ban, pet stores paid $30–65 for Subject Enterprise's transport of each puppy. After, pet stores paid approximately $900 for the same "transport" of each puppy.

173.   Subject Enterprise deposited these payments in its account, only to turn around and pay all but a small cut of those funds to J.A.K.'s.

174.   The new system was made possible by Defendant TBHF LLC, which created sham invoices purporting to document "transport costs," despite knowing that substantially all of the amounts were not for transportation. This was done upon J.A.K.'s request.

175.   In December 2018, J.A.K.'s asked Subject Enterprise to vet the pet stores' payments to ensure each check handed to Subject Enterprise employees upon

delivering J.A.K.'s puppies to their pet store were "PAYABLE TO SUBJECT ENTERPRISE!!!"

176.   A partial collection of records from December 2018 to March 2019 demonstrates that Subject Enterprise deposited hundreds of thousands of dollars in supposed "transport costs" from several pet stores, including Defendant Animal Kingdom, in that four month period alone.

| DATE | FROM | AMOUNT DEPOSITED |
|---|---|---|
| 12/13/2018 | Puppies 4 Less | $3,465.00 |
| 12/19/2018 | Bark Boutique | $8,000.00 |
| 12/19/2018 | Puppies 4 Less | $4,510.00 |
| 12/19/2018 | Puppies 4 Less | $1,895.00 |
| 12/19/2018 | Bark Boutique | $3,680.00 |
| 12/19/2018 | Escondido Pets | $14,350.00 |
| 12/26/2018 | Puppies 4 Less | $5,715.00 |
| 12/26/2018 | Animal Kingdom | $10,375.00 |
| 1/11/2019 | Puppies 4 Less | $8,610.00 |
| 1/11/2019 | Bark Boutique | $560.00 |
| 1/11/2019 | Escondido Pets | $350.00 |
| 1/11/2019 | Animal Kingdom | $16,015.00 |
| 1/11/2019 | Animal Kingdom | $1,750.00 |
| 1/17/2019 | Animal Kingdom | $21,735.00 |
| 1/17/2019 | Puppies 4 Less | $4,485.00 |
| 1/17/2019 | Bark Boutique | $8,755.00 |
| 1/17/2019 | Escondido Pets | $2,350.00 |
| 1/25/2019 | Puppies 4 Less | $2,795.00 |
| 1/25/2019 | Bark Boutique | $2,545.00 |
| 1/25/2019 | Bark Adoptions | $250.00 |
| 1/31/2019 | Puppies 4 Less | $3,960.00 |
| 1/31/2019 | Animal Kingdom | $10,715.00 |
| 1/31/2019 | Bark Boutique | $3,085.00 |
| 2/16/2019 | Puppies 4 Less | $600.00 |
| 2/16/2019 | Puppies 4 Less | $2,665.00 |
| 2/16/2019 | Animal Kingdom | $17,955.00 |
| 2/25/2019 | Puppies 4 Less | $5,945.00 |
| 2/25/2019 | Animal Kingdom | $10,520.00 |
| 3/3/2019 | Animal Kingdom | $12,365.00 |

| 3/11/2019 | Puppies 4 Less | $4,865.00 |
|-----------|----------------|-----------|
| 3/18/2019 | Animal Kingdom | $12,635.00 |
| 3/18/2019 | Puppies 4 Less | $4,800.00 |
| 3/18/2019 | Bark Ave | $7,585.00 |
| 3/18/2019 | Bark Ave | $3,325.00 |
| 3/18/2019 | Bark Ave | $4,465.00 |
| 3/21/2019 | Puppies 4 Less | $3,665.00 |
| 3/21/2019 | Animal Kingdom | $17,950.00 |

177.   Defendant Animal Kingdom paid $132,015.00 for the "transport" of approximately 143 puppies delivered by Defendant Subject Enterprise from Defendants J.A.K.'s and Rescue Pets Iowa during the first three months of 2019. This is in addition to the nearly $10,000 that Defendant Animal Kingdom had paid to Defendant Bark Adoptions pursuant to those puppies' "Adoption Agreements."

178.   The pet stores' payments ultimately went to J.A.K.'s. The pet stores would hand the check to Subject Enterprise at the time of each puppy delivery, and Subject Enterprise would then deposit the checks in its bank account, after which it would transfer the funds to J.A.K.'s.

179.   On January 17, 2019 and January 25, 2019, for example, Subject Enterprise deposited checks that it received from Defendant Animal Kingdom as well as from pet stores Puppies 4 Less, Bark Boutique, and Escondido Pets for the delivery of puppies. The checks totaled $42,915. On January 28, 2019, Subject Enterprise transferred $40,830 to J.A.K.'s.

180.   Similarly, on March 18, 2019 and March 21, 2019, for example, Subject Enterprise deposited checks that it received from Defendant Animal Kingdom as well as from Puppies 4 Less, and Bark Avenue Puppies for the delivery of puppies. The checks totaled $54,425. A few days later, on March 26, 2019, Subject Enterprise transferred $50,065 to J.A.K.'s.

181.   Defendants similarly used Pet Connect Rescue as a conduit to funnel money from the pet stores to the other defendants. For example, Pet Connect Rescue would collect enormous transport fees of approximately $800 per puppy from the pet stores and, upon information and belief, remit the majority of the money to other Defendants including J.A.K.'s.

**VII.   Defendants Sell Puppy Mill Dogs to Consumers for Thousands of Dollars under the False Pretense that the Dogs Are "Rescues."**

182.   Each Defendant as well as the Pet Stores had arrangements to acquire and transfer puppy mill puppies disguised as "rescue" animals for retail sale in California, including at Defendant Animal Kingdom's stores.

183.   All Defendants and the Pet Stores falsified the source of the animals supplied to and sold in California pet stores. Each similarly misrepresented the non-profit status and nature of the businesses of Defendants Bark Adoptions, Rescue Pets Iowa, and Pet Connect Rescue as animal rescue groups. The Defendants together trafficked in the unlawful and unfair scheme of offering animals for sale in California for profit.

184.   Every customer was exposed to these misrepresentations.

185.   Under the Puppy Mill Ban, each pet store was required to post a sign "in a conspicuous location on the cage or enclosure of each animal" listing the name of the supposed public animal control agency or shelter, society for the prevention of cruelty to animals shelter, or nonprofit rescue from which each animal was obtained. Cal. Health & Safety Code § 122354.5(c) (2019). The cage cards exposed every customer to the misrepresentation that the puppies they were about to buy had been obtained legally from a bona fide rescue group.

186.   For instance, the Chavez and Ramirez operated store Temecula Puppies posted signs displaying pure bred and designer puppies for sale in February 2019 and sourced from "Bark Adoptions Menifee." The cage card shown here, like other cage cards in Chavez's stores in 2019, did not explain that Defendant Bark Adoptions

likely obtained this beagle on or around January 28, 2019, from Rescue Pets Iowa and J.A.K.'s. An image of the cage card is below.



187.    The Salinas Pet Stores each displayed similar signs, such as one from February 20, 2019, posted in Broadway Puppies. The card lists a Puggle born December 13, 2018 for sale with his source listed as "Pet Connect Rescue Joplin MO." The cage card did not share with consumers that Pet Connect Rescue likely obtained the pug on or around February 17, 2019, from Rescue Pets Iowa and J.A.K.'s. An image of the cage card is below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21     188.   Defendant Animal Kingdom similarly posted deceptive signs to sell its

22  puppies in each of its stores in 2019, such as a cage card prominently showing the

23  Pembroke Welsh Corgi acquired from Bark Adoptions Rescue. An image of the cage

24  card is below.

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



189.   In 2019, Puppies 4 Less similarly sold puppies labeled as coming from Defendants Bark Adoptions and Pet Connect Rescue.

190.   Every customer was also exposed to the "rescue" misrepresentation at the time of sale. Cal. Health & Safety Code § 122140(b)(1) (2019) required every pet store to provide customers with a written statement containing the source of the dog. A sample disclosure, showing the source of a puppy sold from Animal Kingdom on March 5, 2019, states the puppy was obtained from "Pet Connect Rescue" and not from a "Breeder" or "Dealer." An excerpt of the pet dealer disclosure, which is similar to all other Pet Stores' disclosures, is below.



-40-
COMPLAINT – CLASS ACTION

191.   The Pet Stores, including Defendant Animal Kingdom, held out their puppy-mill puppies as rescues, assuring potential consumers they were not obtained from breeders or brokers for compensation.

192.   In addition to the repeated display on cage cards and in dealer disclosures of the "rescues" each puppy was purportedly obtained from, Pet Store employees explicitly misrepresented the provenance of the animals being sold.

193.   On February 9, 2019, for example, the manager of Defendant Animal Kingdom's San Luis Obispo location told an undercover investigator that the store had a purebred, ten-week old Corgi for sale for $2,199 but could not provide registration papers attesting to its pedigree because it was from a "rescue."

194.   Defendant Animal Kingdom's Facebook Page stated that all of its puppies were "2019 compliant" because they all "come through rescue groups."

195.   After 2019, the Salinas Pet Stores advertised their puppies as rescues whose sale was compliant with the Puppy Mill Ban. The Fancy Puppy specifically advertised that they were selling "Rescue" puppies. Broadway Puppies advertised on their website that they "make sure our puppies come from rescue partners only, not puppy mills." In the store, signs adorning the puppies' cages identified them as from Bark Adoptions or Pet Connect Rescue.

196.   The Pet Stores also falsely told customers that some of the dogs were sourced from local shelters. For example, Broadway Puppies would tell a customer that a puppy came from a local shelter, when in reality the dog came from J.A.K.'s.

197.   As shown in Certificates of Veterinary Inspection signed by Defendant Noethe and large payments from the Pet Stores, including Defendant Animal Kingdom, that were being funneled back to J.A.K.'s through Subject Enterprise as transportation costs, the Pet Stores knew J.A.K.'s ordered the puppies from commercial private breeders and puppy mills for weekly distribution into California pet stores. Yet each misrepresented the puppies to consumers as "rescues" needing rehoming.

198.   The Sham Rescues coordinated and acted in concert with J.A.K.'s and the other Defendants, as well as the Pet Stores, to launder puppy mill dogs for compensation and personal gain, under the false pretense that Defendants Bark Adoptions, Rescue Pets Iowa, and Pet Connect Rescue were animal rescue groups. Bark Adoptions advertised itself through social media as a nonprofit and local rescue working with shelters, rescues, and adoptive partners.

199.   Bark Adoptions' website, maintained by Vaughn, stated:

> Bark Adoptions started to rescue pet animals from situations where the pet animals are unwanted, undesired or flawed and placed rescue pet animals via our rescue partners into secure homes through adoptions or foster care. Our mission is to work with rescues, shelters, humane society's [sic], and animal care facilities to help home unwanted, undesired, abandoned and surrendered strays and pet animals into loving homes via rescue partners, fostering, pet stores, and adoptions. We strive to help pet owners who can't afford sterilization, and to provide underfunded shelters with donations so that they can continue to care for, feed, clean, and house animals.

200.   Defendants perpetrated this scheme for financial gain.

201.   The Pet Stores, including Defendant Animal Kingdom, regularly sold the puppies obtained from J.A.K.'s for $2,000 and more. The proceeds from these sales were distributed throughout Defendants' puppy laundering network among Bark Adoptions and Pet Connect Rescue, Subject Enterprise, TBHF LLC and J.A.K.'s and its puppy mill sources. This is far more than the $180 or less for stray and abandoned dogs that animal rescue organizations typically charge as an adoption fee for true rescues. *See, e.g.*, Adoption Rates, Central California SPCA https://www.ccspca.com/support-the-ccspca/adopt/adoption-rates/ (last visited December 15, 2021) (example adoption rate).

202.   Defendants hide the distribution of their profits from the laundering by referring to them as "donations" or "fees" associated with adoptions, or transport costs for delivery of the animals from J.A.K.'s to the Pet Stores.

**VIII.   Plaintiffs Were Deceived into Buying Commercially Bred Puppies.**

203.   Defendants' laundering scheme did not only harm the puppies bred in unsanitary and unsafe conditions and bargained for across state lines. California consumers also suffered.

204.   As the Iowa Attorney General determined, Defendants' puppy laundering "deceptively preempts consumers' concerns about buying dogs bred within puppy mills," and therefore "inherently entails uninformed purchases by consumers, and unavoidable injuries stemming from lying to consumers – overly and by deliberate omission – about the source of [the] pupp[ies]." Iowa AG Petition at 4.

205.   Rebecca Carey is a California resident who visited Defendant Animal Kingdom's Grover Beach location on January 15, 2019, where she purchased Sonnie, a "Cockapoo" (Cocker Spaniel / poodle blend) for approximately $1,800.00.

206.   Carey believed that Sonnie was a rescue. The card on Sonnie's cage (shown below) stated that she had been acquired through "Bark Adoption Rescue" and the purchase documents indicated the puppy's source was "Bark Adoption Rescue." Animal Kingdom staff also told Carey that Sonnie came from a rescue.



-43-

207.   Carey purchased Sonnie because she believed she was a rescue. Carey would not have purchased Sonnie if she knew she was sold in violation of California law. Carey would not have knowingly supported Defendants' black market puppy trade.

208.   The paperwork attached to Sonnie's display cage said that Sonnie was born on October 28, 2018, making her approximately 11 weeks old at the time of purchase. It also showed Sonnie's microchip number as 991001001879952.

209.   Certificates of Veterinary Inspection show the same microchip number listed for a female cocker spaniel/poodle blend dog that was transferred from Rescue Pets Iowa to Bark Adoptions on January 7, 2019.

210.   Bark Adoptions transferred Sonnie to Animal Kingdom.

211.   Plaintiff Cody Latzer is a California resident who searched for a dog to adopt during the "National Adoption Week" held during February 2019. In his search, Latzer viewed a female Australian cattle dog at one of two Animal Kingdom locations he visited.

212.   At Animal Kingdom, Latzer observed approximately ten to twelve dogs displayed in glass cages, with prices ranging from $1,200-1,700.

213.   Latzer did not adopt any animals during his initial visits to Animal Kingdom.

214.   Around the same time, Latzer had considered adopting a dog from Woods Humane Society in San Louis Obispo. After his visit, however, the dog he was interested in was adopted. So, two weeks after his initial visit, Latzer returned to Animal Kingdom.

215.   On March 5, 2019, Latzer purchased the same female Australian cattle dog he had previously seen, "Sadie," from Defendant Animal Kingdom's San Luis Obispo location. Including a sterilization deposit and sales tax, the total price came to $1,763.99.

216.   Latzer believed that Sadie was a rescue. The card on Sadie's cage stated that she had been acquired through "Pet Connect Rescue," and the purchase documents similarly listed her source as "Pet Connect Rescue."

217.   Latzer purchased Sadie because he believed she was a rescue. Latzer would not have purchased Sadie if he knew she was sold in violation of California law. He would not have knowingly supported Defendants' black market puppy trade.

218.   The paperwork showed Sadie was born on December 10, 2018, making her less than three months old at the time of purchase. It showed Sadie's microchip number as 991001001874569.

219.   Certificates of Veterinary Inspection show the same microchip number listed for a female Australian cattle dog that was transferred from Rescue Pets Iowa to Pet Connect Rescue on February 10, 2019.

220.   Defendant Pet Connect Rescue transferred Sadie to Defendant Animal Kingdom in California.

221.   The cage cards Carey and Latzer observed, and the adoption documents they received, are typical of the cage cards and adoption documents that Defendant Animal Kingdom and the other Pet Stores provided to every customer, including the representation that the puppies were sourced from a rescue.

## CLASS ACTION ALLEGATIONS

222.   This action is maintainable as a class action under Federal Rule of Civil Procedure 23.

223.   The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiffs bring this class action and seek certification of the claims and certain issues in this action on behalf of a class of individuals defined as:

All persons who, on or after January 1, 2019, purchased dogs in the State of California supplied by J.A.K.'s. Excluded from the Class are (1) Defendants and their legal representatives, officers, directors, assigns, and

successors; and (2) the judge to whom this case is assigned and the judge's staff.

224. All members of the class are similarly affected by Defendants' puppy laundering and selling scheme.

## I.   Numerosity.

225. During the class period, more than 1,500 individuals purchased puppies in California sourced from J.A.K.'s.

226. Consumers in the class are so numerous as to make joinder impracticable, if not impossible. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

## II.   Common Questions of Law and Fact Predominate.

227. There are numerous questions of law and fact that are common to Plaintiffs and class members that predominate over questions affecting only individual class members, including:

    a.  Whether Defendants' practices for procuring and labeling puppies were unfair and/or unlawful in any respect;

    b.  Whether dogs supplied by J.A.K.'s could be legally sold in California after January 1, 2019 merely by being funneled through sham "rescue" organizations;

    c.  Whether Defendants' conduct caused class members damages;

    d.  Whether Defendants' conduct is deserving of punitive and/or treble damages;

    e.  Whether Plaintiffs and class members are entitled to injunctive relief.

**III.    Typicality.**

228.    The claims asserted by Plaintiffs in this action are typical of the claims of all Class Members, as the claims arise from the same course of conduct by Defendants, and the relief sought is common among Class Members. Further, there are no defenses available to Defendants that are unique to Plaintiffs.

**IV.    Adequacy.**

229.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, and they have retained counsel competent and experienced in both consumer protection and class action litigation and the Puppy Mill Ban. Plaintiffs and Plaintiffs' counsel will fairly and adequately protect Class Members' interests. Undersigned counsel have represented consumers in a variety of actions where they have sought to protect consumers from fraudulent and deceptive practices.

**V.    Predominance and Superiority of Class Action.**

230.    The prerequisites to maintaining a class action pursuant to Rule 23(b) are met because questions of law and fact common to each Class Member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

231.    A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of the Class Members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class Members. Each Class Member has been damaged and is entitled to recovery as a result of the violations alleged herein.

232.    Moreover, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class Members to redress the wrongs done to them, while an important public interest will be served by addressing the

matter as a class action. Class action treatment will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

233. Plaintiffs are unaware of any difficulties in managing this case that should preclude class action.

## VII. Declaratory and Injunctive Relief.

234. Certification also is appropriate under Rule 23(b) because Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the injunctive relief sought on behalf of the Class. Further, given the large number of purchasers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

## FIRST CAUSE OF ACTION

### Violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1962(c)

### (By Plaintiffs Against All Defendants)

235. Plaintiffs reallege and incorporate by reference each of the allegations of the preceding paragraphs as if set forth fully herein.

236. RICO, Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

237. Defendants created and/or participated in the affairs of an illegal enterprise (the "California Puppy Laundering Enterprise"), the direct purpose of which was to deceive regulators and consumers into believing dogs sourced from commercial puppy mills were "rescues" and to profit from their importation and illegal sale in California. Defendants' acts in furtherance of the California Puppy Laundering Enterprise violate Section 1962(c).

238.   Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

239.   Defendants are members of and constitute an "association-in-fact" enterprise.

240.   At all relevant times, the California Puppy Laundering Enterprise: (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing organization consisting of legal entities and individuals, including J.A.K.'s, Subject Enterprise, and Rescue Pets Iowa, and other entities and individuals associated for the common purpose of brokering, distributing, and selling puppy mill dogs in California through sham rescues, deceptive transport routes, transfer documents, invoices, and payment arrangements, and misleading marketing and labeling, and deriving revenue and profits from those activities. Each Defendant shared in the benefits derived from revenue generated by the scheme to defraud California consumers.

241.   The California Puppy Laundering Enterprise engaged in and its activities affected interstate commerce because it involved commercial activities across state boundaries, such as brokering and transporting dogs from the Midwest to California and the receipt of monies for sale of those dogs.

242.   Defendants participated in the operation and management of the California Puppy Laundering Enterprise by directing its affairs, as described herein. While the Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

243.   To carry out their scheme to defraud, Defendants conducted or participated in the conduct of the affairs of the California Puppy Laundering Enterprise through a pattern of racketeering activity that: (a) used mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud); (b)

laundered money in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) (promotional money laundering) and 1956(a)(1)(B)(i) (money laundering by concealment); (c) transacted in criminally derived property in violation of 18 U.S.C. § 1957; and (d) repeatedly violated the Travel Act, 18 U.S.C. §§ 1952(a)(1) or 1952(a)(3) (collectively referred to as "Predicate Acts" and described in more detail above and in paragraphs 244 through 281).

### i.   **Mail and Wire Fraud**

244.   The electronic mail communications, wire transfers, PayPal payments, and telephone calls set forth in Paragraphs 61 through 120, Paragraphs 155 through 181, and Paragraphs 246 through 249 were transmitted by Defendants, and/or were caused to be transmitted or reasonably foreseen to be caused by Defendants, by means of wire and/or radio communications in interstate commerce.

245.   The deliveries of puppies and monetary instruments to and from Iowa and California set forth in Paragraphs 61 through 120 and Paragraphs 146 through 181 by Subject Enterprise, a private or commercial interstate carrier, was similarly caused by and/or reasonably foreseeable to every Defendant.

246.   As set forth in Paragraphs 61 through 221, each Defendant participated in a scheme that relied on the above-described uses of interstate mails and wires. One of the first steps in that scheme, for example, was for the J.A.K.'s Defendants to notify the Rescue Pets Iowa Defendants, by electronic mail communication, of how many puppies were available to be laundered as fake rescues and sold to California consumers. The Rescue Pets Iowa Defendants, in turn, would send interstate electronic mail communications to Bark Adoptions at J.A.K.'s' behest to communicate how many puppies J.A.K.'s had selected to send there. Sometimes, the Rescue Pets Iowa Defendants would channel their communication with the Bark Adoptions Defendants through the Pet Connect Rescue Defendants, with whom they also communicated by interstate electronic mail communications and telephone calls. Once the Bark Adoptions Defendants knew how many puppies were available for

1  sale, they would send electronic mail communications to the Pet Stores to determine

2  how many puppies they could take. The Bark Adoptions Defendants would then relay

3  that information to the Rescue Pets Iowa Defendants (and, therefore, J.A.K.'s) through

4  interstate electronic mail communications.

5      247.  After confirming the number of puppies that they would launder into

6  California as fake rescues, each Defendant communicated with the Subject Enterprise

7  Defendants to coordinate the interstate transport of puppies. Upon information and

8  belief, every Defendant communicated, and/or caused or reasonably could foresee

9  communications, with the Subject Enterprise Defendants through the use of interstate

10  wire facilities, including telephone calls and electronic mail communications.

11      248.  For example, a partial collection of records from January 2019 to

12  September 2019 demonstrates that Defendants coordinated the transfer of puppies

13  from Iowa to California through the following electronic mail communications:

| DATE | FROM | TO | DESCRIPTION |
|---|---|---|---|
| 1/6/2019 7:34pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 98 puppies. |
| 1/6/2019 7:37pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 98 puppies on behalf of JAKs. |
| 1/6/2019 8:15pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 98 puppies. |
| 1/6/2019 9:16pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 98 puppies. |
| 1/6/2019 9:17pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 98 puppies to California. |
| 1/13/2019 9:31pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 115 puppies. |
| 1/13/2019 9:32pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 115 puppies on behalf of JAKs. |
| 1/13/2019 9:53pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for 95-100 puppies. |

| | | | |
|---|---|---|---|
| 1/13/2019 9:55pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.org | Email notifying JAKs that there is a place for 95-100 puppies. |
| 1/13/2019 10:01pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 95-100 puppies to California. |
| 1/20/2019 7:45pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 60 puppies. |
| 1/20/2019 7:48pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 60 puppies on behalf of JAKs. |
| 1/20/2019 8:25pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 60 puppies. |
| 1/20/2019 8:26pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 60 puppies. |
| 1/20/2019 8:26pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 60 puppies to California. |
| 1/27/2019 6:59pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 90 puppies. |
| 1/27/2019 7:02pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 90 puppies on behalf of JAKs. |
| 1/27/2019 7:22pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 90 puppies. |
| 1/27/2019 7:23pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 90 puppies. |
| 1/27/2019 7:30pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 90 puppies to California. |
| 2/10/2019 7:25pm | jakspuppies@jakspuppies.org | info@rescuepetsiowa.org | Email requesting placement of a certain number of puppies. |
| 2/10/2019 7:28pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of a certain number of puppies on behalf of JAKs. |
| 2/10/2019 8:06pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for 40 puppies. |
| 2/10/2019 8:09pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for 40 puppies. |
| 2/10/2019 8:09pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 35-40 puppies to California. |

| | | | |
|---|---|---|---|
| 3/10/2019 5:45pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 51 puppies. |
| 3/10/2019 6:00pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 51 puppies on behalf of JAKS. |
| 3/10/2019 6:53pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for 43 puppies. |
| 3/10/2019 6:58pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKS that there is a place for 43 puppies. |
| 3/10/2019 6:58pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 43 puppies to California. |
| 3/16/2019 6:46pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 108 puppies. |
| 3/16/2019 6:53pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 108 puppies on behalf of JAKS. |
| 3/16/2019 8:07pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for 100 puppies. |
| 3/16/2019 8:09pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKS that there is a place for 100 puppies. |
| 3/16/2019 8:09pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 100 puppies to California. |
| 3/24/2019 7:42pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 40 puppies. |
| 3/24/2019 7:55pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 40 puppies on behalf of JAKS. |
| 3/24/2019 8:32pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 40 puppies. |
| 3/24/2019 8:39pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKS that there is a place for all 40 puppies. |
| 3/24/2019 8:43pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 28 puppies to California. |
| 3/31/2019 4:29pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 64 puppies. |
| 3/31/2019 4:50pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 64 puppies on behalf of JAKS. |

COMPLAINT – CLASS ACTION

| | | | |
|---|---|---|---|
| 3/31/2019 7:19pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 64 puppies. |
| 3/31/2019 7:24pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 64 puppies. |
| 3/31/2019 7:26pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 60 puppies to California. |
| 4/7/2019 2:57pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 40 puppies. |
| 4/7/2019 3:24pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 40 puppies on behalf of JAKs. |
| 4/7/2019 8:27pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 40 puppies. |
| 4/7/2019 8:37pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 40 puppies. |
| 4/7/2019 8:37pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 40 puppies to California. |
| 4/14/2019 2:33pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 70 puppies. |
| 4/14/2019 2:47pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 70 puppies on behalf of JAKs. |
| 4/14/2019 5:19pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 70 puppies. |
| 4/14/2019 5:37pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 70 puppies. |
| 4/14/2019 5:47pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 62 puppies to California. |
| 4/21/2019 7:46pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 60 puppies. |
| 4/21/2019 7:50pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of 60 puppies on behalf of JAKs. |
| 4/21/2019 8:57pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 60 puppies. |
| 4/21/2019 9:12pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 60 puppies. |
| 4/21/2019 9:13pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 60 puppies to California. |

| | | | |
|---|---|---|---|
| 4/28/2019 6:55pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of a certain number of puppies. |
| 4/28/2019 7:05pm | info@rescuepetsiowa.org | info@barkadoptions.org | Email requesting placement of a certain number of puppies on behalf of JAKs. |
| 4/28/2019 8:50pm | info@barkadoptions.org | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for 66 puppies. |
| 4/28/2019 8:54pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for 66 puppies. |
| 4/28/2019 9:02pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 66 puppies to California. |
| 5/5/2019 6:14pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 50 puppies. |
| 5/5/2019 6:22pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 50 puppies on behalf of JAKs. |
| 5/5/2019 7:56pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 50 puppies. |
| 5/5/2019 7:58pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKS that there is a place for all 50 puppies. |
| 5/5/2019 8:00pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 40 puppies to California. |
| 5/12/2019 9:04pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 50 puppies. |
| 5/12/2019 9:10pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 45 puppies on behalf of JAKs. |
| 5/12/2019 9:15pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 45 puppies. |
| 5/12/2019 9:31pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all puppies. |
| 5/12/2019 9:35pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 42 puppies to California. |
| 5/19/2019 8:27pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 75 puppies. |
| 5/19/2019 8:31pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 75 puppies on behalf of JAKs. |
| 5/19/2019 | barkadoptionsr | info@rescuep | Email notifying Rescue Pets Iowa |

| | | | |
|---|---|---|---|
| 9 8:56pm | escue@gmail.com | etsiowa.org | that Bark Adoptions had found a place for all 75 puppies. |
| 5/19/2019 9:07pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 75 puppies. |
| 5/19/2019 9:07pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 75 puppies to California. |
| 6/2/2019 6:45pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 85 puppies. |
| 6/2/2019 7:02pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 85 puppies on behalf of JAKs. |
| 6/2/2019 7:23pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 85 puppies. |
| 6/2/2019 7:33pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 85 puppies. |
| 6/2/2019 7:53pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 74 puppies to California. |
| 6/9/2019 12:16am | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 82 puppies. |
| 6/9/2019 8:19pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 82 puppies on behalf of JAKs. |
| Upon information and belief, on June 9, 2019, between the hours of 8:19pm and 11:43pm, Bark Adoptions sent an electronic mail notifying Rescue Pets Iowa that they found a place for 70-80 puppies. | | | |
| Upon information and belief, on June 9, 2019, Rescue Pets Iowa sent an electronic mail to JAKs notifying them that there is a place for 70-80 puppies. | | | |
| 6/9/2019 11:43pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 70-80 puppies to California. |
| 6/23/2019 10:10pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 40-45 puppies. |
| 6/23/2019 10:27pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 40-45 puppies on behalf of JAKs. |
| 6/23/2019 10:28pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 40-45 puppies. |
| 6/23/2019 10:34pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all puppies. |
| 6/23/2019 10:41pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 44 puppies to California. |

| | | | |
|---|---|---|---|
| 6/30/2019 10:16pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 43 puppies. |
| 6/30/2019 10:22pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 43 puppies on behalf of JAKs. |
| 6/30/2019 10:33pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 43 puppies. |
| 6/30/2019 10:37pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 43 puppies. |
| 6/30/2019 10:37pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 43 puppies to California. |
| 7/7/2019 9:00pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 70 puppies. |
| 7/7/2019 9:08pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 70 puppies on behalf of JAKs. |
| 7/7/2019 9:39pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 70 puppies. |
| 7/7/2019 9:44pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 70 puppies. |
| 7/7/2019 9:53pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 66 puppies to California. |
| 7/14/2019 7:51pm | jakspuppies@jakspuppies.com | info@rescuetpetsiowa.org | Email requesting placement of 50 puppies. |
| 7/14/2019 8:07pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 50 puppies on behalf of JAKs. |
| 7/14/2019 8:19pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 50 puppies. |
| 7/14/2019 8:25pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 50 puppies. |
| 7/14/2019 8:28pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 49 puppies to California. |
| 7/21/2019 10:00pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 64 puppies. |
| 7/21/2019 10:02pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 55-65 puppies on behalf of JAKs. |
| 7/21/2019 | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a |

COMPLAINT – CLASS ACTION

| | | | |
|---|---|---|---|
| 10:27pm | om | | place for all 55-65 puppies. |
| 7/21/2019 10:32pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 64 puppies. |
| 7/21/2019 10:43pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 57 puppies to California. |
| 7/28/2019 9:42pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 100 puppies. |
| 7/28/2019 9:47pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of 100 puppies on behalf of JAKs. |
| 7/28/2019 9:53pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all 100 puppies. |
| 7/28/2019 11:00pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 100 puppies. |
| 7/28/2019 11:26pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 58 puppies to California. |
| 8/4/2019 7:39pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 50-70 puppies. |
| 8/4/2019 8:13pm | info@rescuepetsiowa.org | barkadoptionsrescue@gmail.com | Email requesting placement of certain number of puppies on behalf of JAKs. |
| 8/4/2019 8:46pm | barkadoptionsrescue@gmail.com | info@rescuepetsiowa.org | Email notifying Rescue Pets Iowa that Bark Adoptions had found a place for all the puppies. |
| 8/4/2019 8:59pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.org | Email notifying JAKs that there is a place for all puppies. |
| 8/4/2019 11:22pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 50 puppies to California. |
| 8/11/2019 7:40pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 120 puppies. |
| Upon information and belief, on August 11, 2019, between the hours of 7:40pm and 10:30 pm, Rescue Pets Iowa sent an electronic mail to Bark Adoptions requesting placement for 120 puppies on behalf of JAKs. | | | |
| Upon information and belief, on August 11, 2019, between the hours of 7:40pm and 10:30pm, Bark Adoptions sent an electronic mail notifying Rescue Pets Iowa that they found a place for all 120 puppies. | | | |
| 8/11/2019 10:30pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.org | Email notifying JAKs that there is a place for all 120 puppies. |
| 8/11/2019 | info@rescuepetsiowa.org | subjectenterprise@gmail.c | Email requesting transport of 65-75 puppies to California. |

| | | | |
|---|---|---|---|
| 10:36pm | | om | |
| 8/18/2019 10:31pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 55 puppies. |

Upon information and belief, on August 18, 2019, between the hours of 10:31pm and 10:53 pm, Rescue Pets Iowa sent an electronic mail to Bark Adoptions requesting placement for 55 puppies on behalf of JAKs.

Upon information and belief, on August 18, 2019, between the hours of 10:31pm and 10:53pm, Bark Adoptions sent an electronic mail notifying Rescue Pets Iowa that they found a place for all 55 puppies.

| | | | |
|---|---|---|---|
| 8/18/2019 10:53pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for all 55 puppies. |
| 8/18/2019 10:55pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 54 puppies to California. |
| 8/25/2019 9:39pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 70-90 puppies. |

Upon information and belief, on August 25, 2019, between the hours of 9:39pm and 10:32 pm, Rescue Pets Iowa sent an electronic mail to Bark Adoptions requesting placement for 70-90 puppies on behalf of JAKs.

Upon information and belief, on August 25, 2019, between the hours of 9:39pm and 10:32pm, Bark Adoptions sent an electronic mail notifying Rescue Pets Iowa that they found a place for all 70-90 puppies.

| | | | |
|---|---|---|---|
| 8/25/2019 10:32pm | info@rescuepetsiowa.org | jakspuppies@jakspuppies.com | Email notifying JAKs that there is a place for 70-90 puppies. |
| 8/25/2019 10:34pm | info@rescuepetsiowa.org | subjectenterprise@gmail.com | Email requesting transport of 74 puppies to California. |
| 9/1/2019 6:49pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 20 puppies. |

Upon information and belief, on September 1, 2019, Rescue Pets Iowa sent an electronic mail to Bark Adoptions requesting placement for 20 puppies on behalf of JAKs.

Upon information and belief, on September 1, 2019, Bark Adoptions sent an electronic mail notifying Rescue Pets Iowa that they found a place for all 20 puppies.

Upon information and belief, on September 1, 2019, Rescue Pets Iowa sent an electronic mail to JAKs notifying them that there is a place for all 20 puppies.

Upon information and belief, on September 1, 2019, Rescue Pets Iowa sent an electronic mail to Subject Enterprise requesting transport of 20 puppies to California.

| 9/7/2019 10:35pm | jakspuppies@jakspuppies.com | info@rescuepetsiowa.org | Email requesting placement of 65 puppies. |
|---|---|---|---|

Upon information and belief, on September 7, 2019, Rescue Pets Iowa sent an electronic mail to Bark Adoptions requesting placement for 65 puppies on behalf of JAKs.

Upon information and belief, on September 7, 2019, Bark Adoptions sent an electronic mail notifying Rescue Pets Iowa that they found a place for all 65 puppies.

Upon information and belief, on September 7, 2019, Rescue Pets Iowa sent an electronic mail to JAKs notifying them that there is a place for all 65 puppies.

Upon information and belief, on September 7, 2019, Rescue Pets Iowa sent an electronic mail to Subject Enterprise requesting transport of 65 puppies to California.

249.   After Subject Enterprise transported the puppies to the Pet Stores, the Pet Stores paid, and/or caused to be paid, the other Defendants by means of interstate mails and wires. For example, a partial collection of records from December 2018 to July 2019 demonstrates how David Salinas used his Wyoming-based corporation, The Puppy Store LLC, to transmit PayPal payments to Bark Adoptions in California.

| DATE | AMOUNT | FROM | TO | NOTE ACCOMPANYING PAYMENT |
|---|---|---|---|---|
| 12/21/2018 | $700.00 | The Puppy Store | Bark Adoptions | Donation |
| 12/21/2018 | $701.00 | The Puppy Store | Bark Adoptions | Donation |
| 12/21/2018 | $699.00 | The Puppy Store | Bark Adoptions | Donation |
| 12/21/2018 | $675.00 | The Puppy Store | Bark Adoptions | |
| 12/31/2018 | $200.00 | The Puppy Store | Bark Adoptions | Donation National City Puppy December 2018 |
| 12/31/2018 | $50.00 | The Puppy Store | Bark Adoptions | Donation The Fancy Puppy December 2018 |
| 12/31/2018 | $250.00 | The Puppy Store | Bark Adoptions | Donation National City Puppy December 2018 |
| 12/31/2018 | $115.00 | The Puppy Store | Bark Adoptions | Donation Hello Puppies December 2018 |
| 12/31/2018 | $120.00 | The Puppy | Bark | |

| | | Store | Adoptions | |
|---|---|---|---|---|
| 1/14/2019 | $870.00 | The Puppy Store | Bark Adoptions | Bark Adoptions |
| 1/14/2019 | $870.00 | The Puppy Store | Bark Adoptions | Bark Adoptions |
| 1/14/2019 | $870.00 | The Puppy Store | Bark Adoptions | Bark Adoptions |
| 1/14/2019 | $870.00 | The Puppy Store | Bark Adoptions | Bark Adoptions |
| 1/30/2019 | $1,500.00 | The Puppy Store | Bark Adoptions | The Fancy Puppy Dec 17 + Jan 22 |
| 1/30/2019 | $1,369.00 | The Puppy Store | Bark Adoptions | National City Puppy Dec 17 + Jan 22 |
| 1/30/2019 | $1,086.00 | The Puppy Store | Bark Adoptions | Hello Puppies Dec 17 + Jan 22 |
| 1/30/2019 | $1,086.32 | The Puppy Store | Bark Adoptions | Broadway Puppies Dec 17 + Jan 22 |
| 2/5/2019 | $2,750.00 | The Puppy Store | Bark Adoptions | Fancy Puppy |
| 2/5/2019 | $1,999.12 | The Puppy Store | Bark Adoptions | Broadway Puppies |
| 2/20/2019 | $3,150.44 | The Puppy Store | Bark Adoptions | National City Puppy |
| 2/20/2019 | $2,245.44 | The Puppy Store | Bark Adoptions | Hello Puppies |
| 3/25/2019 | $2,100.00 | The Puppy Store | Bark Adoptions | The Fancy Puppy |
| 3/25/2019 | $1,780.00 | The Puppy Store | Bark Adoptions | National City Puppy |
| 3/25/2019 | $1,465.00 | The Puppy Store | Bark Adoptions | Broadway |
| 3/25/2019 | $1,260.00 | The Puppy Store | Bark Adoptions | Hello Puppies |
| 4/29/2019 | $1,705.00 | The Puppy Store | Bark Adoptions | National City Puppy |
| 4/29/2019 | $1,915.00 | The Puppy Store | Bark Adoptions | The Fancy Puppy |
| 4/29/2019 | $1,705.00 | The Puppy Store | Bark Adoptions | Broadway Puppies |
| 4/29/2019 | $1,355.00 | The Puppy Store | Bark Adoptions | Hello Puppies |
| 5/8/2019 | $2,670.00 | The Puppy Store | Bark Adoptions | National City Puppy |
| 5/8/2019 | $1,970.00 | The Puppy Store | Bark Adoptions | Fancy Puppy Donation |
| 5/8/2019 | $1,680.00 | The Puppy Store | Bark Adoptions | Broadway Donation |
| 5/8/2019 | $1,360.00 | The Puppy Store | Bark Adoptions | Hello Puppies |
| 5/23/2019 | $1,680.00 | The Puppy Store | Bark Adoptions | Broadway Puppies |
| 5/23/2019 | $3,280.00 | The Puppy Store | Bark Adoptions | National City Puppy |

| 5/23/2019 | $3,000.00 | The Puppy Store | Bark Adoptions | Fancy Puppy |
|-----------|-----------|-----------------|----------------|-------------|
| 5/23/2019 | $2,280.00 | The Puppy Store | Bark Adoptions | Hello Puppies |
| 7/7/2019 | $5,840.00 | The Puppy Store | Bark Adoptions | Fancy Invoices |
| 7/7/2019 | $4,320.00 | The Puppy Store | Bark Adoptions | HP Invoices |
| 7/9/2019 | $6,280.00 | The Puppy Store | Bark Adoptions | National City |
| 7/9/2019 | $4,470.00 | The Puppy Store | Bark Adoptions | Broadway Puppies |

250.   The interstate mail and wire transmissions described herein were all made in furtherance and execution of Defendants' scheme to defraud and a common course of conduct to deceive regulators and consumers and lure consumers into purchasing puppies, which Defendants knew or recklessly disregarded were sourced from puppy mills and sold in violation of the Puppy Mill Ban, despite Defendants holding the puppies out as "rescues."

251.   Defendants' activities constituted a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omissions within the meanings of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, in which Defendants each conducted or participated knowingly and with the intent to defraud. To achieve their common goals, Defendants hid from regulators, consumers, and the public the true provenance of the dogs they brokered, distributed, and unlawfully sold in California.

252.   Each Defendant benefited from the fraud: they all received compensation and professional success.

253.   Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the source of the laundered puppies. Defendants further knew and intended that Plaintiffs and Class members would incur costs and damages as a result.

254.   Plaintiffs and Class members did rely on Defendants' misrepresentations and omissions about the provenance of the puppy mill dogs as shown by, *inter alia*, the fact that Plaintiffs and Class members purchased dogs that should never have been introduced into the stream of commerce in California and whose fair market value was far less than what was paid.

255.   Each of the interstate mail and wire transmissions described herein is individually indictable as an act of mail and/or wire fraud under 18 U.S.C. § 1341 and 18 U.S.C. § 1343. As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

## ii.   <u>Money Laundering: Promotional Money Laundering</u>

256.   By their foregoing conduct set forth in Paragraphs 61 through 221 each Defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity (to wit, mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, as set forth in Paragraphs 244 through 255; and in violation of the Travel Act, 18 U.S.C. §§ 1952(a)(1) and (3), as set forth in Paragraphs 271 through 273, with the intent to promote the carrying on of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

257.   Each of the wire transfers between financial institutions, checks, PayPal payments, and other transfers of money set forth in Paragraphs 61 through 120, Paragraphs 155 through 181, and Paragraphs 246 through 249 involve the use of financial institutions that affect interstate or foreign commerce, or otherwise involve the movement of funds and monetary instruments in a way that affects interstate commerce, and therefore constitute financial transactions.

258.   Each Defendant knew the ongoing payments represented the proceeds of some unlawful activity—the puppy laundering scheme—and such property was in fact derived from the proceeds of specified unlawful activity of mail fraud and wire fraud

in violation of 18 U.S.C. §§ 1341 & 1343, and in violation of the Travel Act, 18 U.S.C. § 1952(a)(1), (3).

259.   Each Defendant derived revenue from the puppy laundering scheme, which was obtained through mail fraud and wire fraud and in violation of the Travel Act. Each Defendant used such proceeds to continue to make payments for puppies, their fake adoption costs, their transportation, the laundering of their legal titles, and various operational costs in order to promote the continuation of the puppy laundering scheme, all constituting specified unlawful activity (mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3)).

260.   The making of each of the payments described herein is individually indictable as an act of promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### iii.   Money Laundering: Money Laundering by Concealment

261.   By their foregoing conduct set forth in Paragraphs 61 through 221, each Defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity, to wit, mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 (Paragraphs 244 through 255), and violations of the Travel Act, 18 U.S.C. § 1952(a)(1), (3) (Paragraphs 271 through 273), knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

262.   Each of the wire transfers between financial institutions, checks, PayPal payments, and other transfers of money set forth in Paragraphs 61 through 120, Paragraphs 155 through 181, and Paragraphs 246 through 249 involve the use of

financial institutions that affect interstate or foreign commerce, or otherwise involve the movement of funds and monetary instruments in a way that affects interstate commerce, and therefore constitute financial transactions.

263.   Each Defendant knew that the ongoing payments represented the proceeds of some unlawful activity——and such property was in fact derived from the proceeds of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343, and violations of the Travel Act, 18 U.S.C. §1952(a)(1), (3).

264.   Each Defendant derived revenue from the puppy laundering scheme, which was obtained through mail fraud and wire fraud and in violation of the Travel Act. Each Defendant concealed such proceeds by depositing such proceeds in financial institutions and using such proceeds in financial institutions by means of wire transfers, checks, PayPal payments, and other transfers of money to continue to make payments for puppies, their fake adoption costs, their transportation, the laundering of their legal titles, and various operational costs in order to promote the continuation of the puppy laundering scheme.

265.   The concealment of the proceeds of the puppy laundering scheme was accomplished by structuring the payments in a highly unusual manner to avoid detection and tracing. For example, the pet stores disguised their payments to J.A.K.'s for the purchase of puppies as "transport costs" which were paid to Subject Enterprise. Once Subject Enterprise deposited the fake transport costs into its bank account, it transmitted the payments by wire transfer between financial institutions to J.A.K.'s. The pet stores would make additional payments to the Sham Rescue Defendants disguised as donations, adoption fees, and/or sterilization deposits.

266.   The making of each of the payments described herein is individually indictable as an act of money laundering by concealment under 18 U.S.C. § 1956(a)(1)(B)(i). As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### iv.   Monetary Transactions in Property Derived from Unlawful Activity

267.   Each Defendant, by participating in the puppy laundering scheme and payments described in Paragraphs 61 through 221 above, knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343; and in violation of the Travel Act under 18 U.S.C. § 1952(a)(1), (3), all indictable or chargeable under 18 U.S.C. § 1961(1), and that took place in the United States or in the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1957.

268.   Each Defendant derived revenue from the puppy laundering scheme, which was obtained through mail fraud and wire fraud and in violation of the Travel Act.

269.   Each Defendant used those proceeds to knowingly engage or attempt to engage in monetary transactions of a value greater than $10,000. For example, with the assistance of the other Defendants, the Pet Stores paid for their purchase of puppies through transactions disguised as "transport costs" that were greater than $10,000 by means of deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution, to Subject Enterprise, which then transmitted the payments by wire transfer between financial institutions to J.A.K.'s.

270.   Participating in each monetary transaction described herein is thus individually indictable as an act of engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957. As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

### v.   <u>Travel Act (18 U.S.C. § 1952)</u>

271.   By their foregoing conduct set forth in Paragraphs 61 through 221, each Defendant travelled in interstate commerce, or used the mail or any facility in interstate or foreign commerce or caused or reasonably could foresee that another Defendant would do so, with intent to distribute the proceeds of any unlawful activity or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, to wit, any act which is indictable under 18 U.S.C. §§ 1956 or 1957.

272.   Defendants travelled between Iowa, Missouri, and California, used the interstate wire facilities of financial institutions in Iowa, Missouri, and California, and made telephone and electronic mail communications from or to Iowa, Missouri, and California using facilities of interstate commerce, with the intent to distribute the proceeds of—and promote, manage, establish, carry on, or facilitate—the money laundering violations set forth in Paragraphs 256 through 270 above in violation of 18 U.S.C. §§ 1956, 1957.

273.   Each such act is individually indictable as a violation of the Travel Act under 18 U.S.C. §§ 1952(a)(1) or 1952(a)(3). As such, each constitutes a separate predicate act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

274.   Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the Predicate Acts.

275.   Defendants engaged in the Predicate Acts for the purpose of obtaining money or property including by means of the omissions, false pretense, and misrepresentations described in the above subsections.

276.   Defendants engaged in a pattern of related and continuous predicate acts from at least July 2017 through May 2020, if not longer. Such activity consists of multiple acts of racketeering by each Defendant, is interrelated, not isolated, and is perpetrated for the same or similar purposes by the same persons. The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5) presents both a

history of criminal conduct and a distinct threat of continuing criminal activity. To the extent that some Defendants have stopped participating in the pattern of racketeering activity or changed their methods of doing so, it is only because they have been caught and faced lawsuits and other enforcement actions. If Defendants had not been caught, they would have continued their racketeering activities unchanged.

277.   The Predicate Acts described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing puppies, which Defendants knew or recklessly disregarded were sourced from puppy mills and sold in violation of the Puppy Mill Ban, despite Defendants holding the puppies out as "rescues."

278.   Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the puppy mill dogs. Defendants further knew and intended that Plaintiffs and Class members would incur costs and damages as a result.

279.   Plaintiffs and Class members relied on Defendants' misrepresentations and omissions about the provenance of the puppy mill dogs as shown by, *inter alia*, the fact that Plaintiffs and Class members purchased dogs that never should have been introduced into the stream of commerce in California and whose fair market value was far less than was paid.

280.   By reason of, and as a result of, the conduct of Defendants, and in particular their pattern of racketeering activity, Plaintiffs and the Class have been injured including by overpaying for puppy mill dogs whose price was artificially inflated by deliberate acts of false statements, omissions and concealment and by Defendants' acts of racketeering.

281.   Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to bring this action for three times their actual damages, as well

1  as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18

2  U.S.C. § 1964(c).

### SECOND CAUSE OF ACTION

### Violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1962(d)

### (By Plaintiffs Against All Defendants)

7  282.   Plaintiffs reallege and incorporate by reference each of the allegations of

8  the preceding paragraphs as if set forth fully herein.

9  283.   Beginning before the Puppy Mill Ban went into effect, Defendants and

10  various other persons, firms, and corporations, including third-party entities and

11  individuals not named as defendants in this Complaint, did unlawfully, knowingly,

12  and intentionally conspire, combine, confederate, and agree together to conduct the

13  affairs of the California Puppy Laundering Enterprise, which was engaged in and

14  which affected interstate commerce through a pattern of racketeering in violation of

15  18 U.S.C. § 1962(c).

16  284.   Defendants and each member of the conspiracy, with knowledge and

17  intent, have agreed to the overall objectives of the conspiracy and participated in the

18  common course of conduct to commit acts of fraud and indecency in procuring,

19  brokering, transferring, marketing, and selling puppy mill dogs in California.

20  285.   Each Defendant agreed that at least two acts of racketeering activity

21  would be committed by a member of the conspiracy to further the California Puppy

22  Laundering Enterprise.

23  286.   It was part of the conspiracy that Defendants and their co-conspirators

24  would commit numerous acts of racketeering activity in the conduct of the affairs of

25  the California Puppy Laundering Enterprise, including the acts of racketeering

26  described in Paragraphs 243 through 281. These acts constitute a pattern of

27  racketeering as defined by 18 U.S.C. §§ 1961(1) and (5).

28

287.   In furtherance of this unlawful conspiracy and to effect its objectives, Defendants committed numerous overt acts, including those set forth in Paragraphs 61 through 221 of this Complaint.

288.   By reason of, and as a result of, Defendants' conduct, and in particular their violations of 18 U.S.C. § 1962(d), Plaintiffs and the Class have been injured including by overpaying for puppy mill dogs whose price was artificially inflated by deliberate acts of false statements, omissions and concealment and by Defendants' acts of racketeering.

289.   Defendants' violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### THIRD CAUSE OF ACTION

### Violation of California Unfair Competition Law,

### California Business & Professional Code § 17200 *et seq*.

### (By Plaintiffs Against All Defendants)

290.   Plaintiffs reallege and incorporate by reference each of the allegations of the preceding paragraphs as if set forth fully herein.

291.   California's Unfair Competition Law ("UCL"), Cal. Business & Professional Code § 17200 *et seq*., proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

292.   By proscribing "unlawful" business practices, the UCL borrows violations of other laws and treats them as unlawful practices that the statute makes independently actionable.

293.   By proscribing "unfair" business practices, the UCL prohibits conduct that offends established public policy when that conduct is tethered to an underlying

constitutional, statutory, or regulatory provision. *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (unfair business practices under the UCL include those that are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers").

294.   By proscribing "fraudulent" business practices, the UCL prohibits conduct that is likely to deceive or mislead members of the public.

295.   The Puppy Mill Ban, Cal. Health & Safety Code § 122354.5, constitutes a public policy to "promote and encourage the availability of shelter animals in California as a source for either adoption or for sale in a pet store establishment," *see* A.B. 485, Senate Floor Analyses at 3 (Ca, Sept. 9, 2017), and combat the supply of puppy mill puppies from factory breeders by preventing the sale of puppy mill dogs through pet shops for financial gain.

296.   Defendants' practices of concealing the provenance of dogs, misrepresenting the dogs as rescues, selling dogs not "obtained from a public animal control agency or shelter, society for the prevention of cruelty to animals shelter, humane society shelter, or rescue group that is in a cooperative agreement with at least one private or public shelter," in violation of both the text and the policy of the Puppy Mill Ban, and using the proceeds of such sales to further their illegal puppy laundering scheme, violate the UCL.

297.   Defendants intentionally and knowingly misrepresented material facts about the provenance of the puppy mill dogs with an intent to mislead regulators, Plaintiffs, and the Class.  Absent the misrepresentations and concealment of material facts enabled by their illegal puppy laundering scheme, Defendants would not have openly sold the puppy mill dogs in California and would not have been able to collect the premium prices they did.

298.   Plaintiffs and Class Members reasonably relied on Defendants' false misrepresentations about the dogs' provenance and the legitimacy of the sales. If Plaintiffs and Class Members had known the truth about the dogs' provenance and the

illegality of their sale, they would not have purchased the dogs or paid the premium prices they did.

299.   If the puppies Defendants laundered and sold to Plaintiffs and Class Members were in fact "obtained from a public animal control agency or shelter, society for the prevention of cruelty to animals shelter, humane society shelter, or rescue group that is in a cooperative agreement with at least one private or public shelter," rather than from for-profit puppy mills and Defendants' laundering operation, Plaintiffs and Class Members would have saved a significant amount of money because legitimate shelters and rescue organizations charge relatively small adoption fees, if anything at all, and typically cover valuable services such as vaccinations and sterilizations.

300.   Plaintiffs and Class Members have suffered injury in fact and lost money because of Defendants' violations of the UCL, including but not limited to the purchase price of the dogs and the cost of associated accessories and services.

301.   Defendants' violations have been serious, numerous, persistent, and willful, and warrant the maximum penalties allowed by law. Defendants' assets, liabilities, and net worth likewise warrant the maximum penalties, including an assessment of punitive damages under Cal. Civil Code § 3294.

302.   To the extent Defendants have not already been permanently enjoined by another court, dissolved, or made an enforceable commitment to cease their illegal puppy laundering activities in California, Defendants' violations present an ongoing harm and risk of harm to Plaintiffs, the Class, and the public interest.

303.   **Aiding and Abetting.** Defendants have independently and collectively engaged in unlawful and unfair business practices in violation of the UCL through the puppy laundering scheme described in this Complaint. All Defendants have committed the requisite actions giving rise to Plaintiffs' claims. Alternatively, in the remaining paragraphs for this claim, Plaintiffs allege that the Sham Rescue Defendants, Defendant J.A.K.'s, Defendant Kirk, Defendant TBHF LLC, Defendant

Coda Subject and Defendant Subject Enterprise are liable for aiding and abetting Defendant Animal Kingdom's contravention of the UCL by providing substantial assistance and encouragement with knowledge of their wrongful conduct.

304.    Under the UCL, "[i]t is unlawful for any manufacturer, wholesaler, distributor, jobber, contractor, broker, retailer, or other vendor, or any agent of any such person, jointly to participate or collude with any other such person in the violation of this chapter." Cal. Bus. & Prof. Code § 17048.

305.    The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise personally participated in the laundering of dogs from puppy mills into California in contravention of the Puppy Mill Ban. The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise are thus violating the UCL by aiding and abetting the Pet Stores, such as those operated by Defendant Animal Kingdom, to directly violate the Puppy Mill Ban by acquiring and offering for sale puppy mill dogs falsely labeled as "rescues" for compensation to California consumers, including Plaintiffs and the Class.

306.    The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise each exercised unbridled control over unlawful and unfair practices perpetuating the puppy laundering scheme, including the acquisition, transportation, and disposition of puppy mill bred dogs into California for sale at pet stores as "rescues." These Defendants committed the puppy laundering practices for compensation and private gain.

307.    The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise's active participation in the scheme to launder puppies in violation of the Puppy Mill Ban resulted in the dissemination of the deceptive and untrue representations regarding the true rescue status of the dogs being sold to California consumers, including Plaintiffs and the Class.

308.    Plaintiffs and Class Members seek restitution and injunctive relief for Defendants' UCL violations.

**FOURTH CAUSE OF ACTION**

**Violations of California Consumer Legal Remedies Act, Cal. Civil Code § 1770 *et seq*.**

**(By Plaintiffs Against All Defendants)**

309.   Plaintiffs reallege and incorporate by reference each of the allegations of the preceding paragraphs as if set forth fully herein.

310.   Plaintiffs and Class Members are consumers as defined by the California Consumer Legal Remedies Act ("CLRA").

311.   Plaintiffs' and Class Members' purchases of the puppy mill puppies from the Pet Stores are transactions as defined by the CLRA.

312.   In violation of several practices declared unlawful by the CLRA, *see* Cal. Civil Code § 1770, the Pet Stores, including but not limited to Defendant Animal Kingdom, falsely represented to consumers that the dogs they sold were from "rescue organizations" compliant with the Puppy Mill Ban, Cal. Health and Safety Code § 122354.5, when, in reality, the dogs were sourced from puppy mills.

313.   **Aiding and Abetting.** The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise participated in the laundering of puppy mill sourced puppies into California in contravention of the Puppy Mill Ban. As such, the Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise have aided and abetted the Pet Stores, including Defendant Animal Kingdom, to mislead consumers about the "rescue" status of the puppy mill dogs sold to Plaintiff and the Class.

314.   The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise each provided substantial assistance and encouragement to the Pet Stores, including Defendant Animal Kingdom, to enable them to sell puppy mill dogs misrepresented as "rescues" to California consumers, including Plaintiffs and the Class, with knowledge that the Pet Stores would misrepresent the true source of the dogs.

315.   J.A.K.'s knowingly acquired puppies from private breeders and puppy mills, and in concert with Coda Subject, Subject Enterprise, Kirk, TBHF LLC, and the Sham Rescue Defendants, laundered them through the fake animal rescue groups to the Pet Stores, including Defendant Animal Kingdom, for sale to unsuspecting California consumers as Puppy Mill Ban compliant "rescue" animals.

316.   The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise sourced dogs from puppy mills and arranged for their transport into California with knowledge of the dogs' provenance. The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise had actual knowledge that the puppies picked up for transport after "rescue" were in fact at J.A.K.'s, if temporarily housed away from the puppy mills at all, and then transported into California for sale.

317.   The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise perpetuated this scheme to launder dogs sourced from puppy mills for sale as "rescues" at California pet stores, including at Defendant Animal Kingdom, beginning before and continuing well after the effective date of the Puppy Mill Ban.

318.   The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise had actual knowledge that all dogs acquired by J.A.K.'s for transport and sale at California pet stores, including at Defendant Animal Kingdom, were sourced from puppy mills outside of California.

319.   Even without knowledge of the Pet Stores' wrongful conduct, The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise are separately responsible for and liable for the CLRA violations by the Pet Stores because they gave the Pet Stores substantial assistance in violating the Puppy Mill Ban, UCL, and CLRA. In addition, The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise's own conduct, separately considered, is a breach of the duties to Plaintiffs and the Class. The Sham Rescue

Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise owed duties to the Plaintiffs and the Class, including duties to not commit intentional torts, to avoid exposing Plaintiffs and the Class to foreseeable harms, and a duty to not injure Plaintiffs and the Class by violating California laws. The Sham Rescue Defendants, J.A.K.'s, Kirk, TBHF LLC, Coda Subject, and Subject Enterprise breached these duties with their own tortious conduct, including their active participation in the scheme to launder puppies in violation of the Puppy Mill Ban, the UCL, and RICO, as described herein. This conduct resulted in the dissemination of the deceptive and untrue representations regarding the true "rescue" status of the dogs sold to California consumers, including to Plaintiffs and the Class Members.

320.   As a result of Defendant Animal Kingdom's violations of the CLRA, which are aided and abetted by all other Defendants, Plaintiffs and Class Members have been injured and lost money, including but not limited to the purchase price of the dogs and the cost of associated accessories and services. If Plaintiffs and Class Members had known the truth about the puppies' provenance and the illegality of their sale, they would not have purchased the dogs or paid the premium prices they did.

321.   Under California Civil Code § 1780, Plaintiffs, on behalf of themselves, Class Members, and the general public, seek an order from this Court:

> f.   For injunctive relief requiring all Defendants to disclose, on their websites and at their stores, that they sell puppies sourced from puppy mills; and

> g.   Plaintiffs intend to amend the Complaint pursuant to California Civil Code § 1782(d) for damages, including actual damages, restitution, and punitive damages, should all Defendants not timely comply with the impending or, in the case of Defendant Animal Kingdom already received, preliminary notice served in compliance with California Civil Code § 1782.

1

**FIFTH CAUSE OF ACTION**

2

**Unjust Enrichment**

3

**(By Plaintiffs Against All Defendants)**

4    322.   Plaintiffs reallege and incorporate by reference each of the allegations of

5    the preceding paragraphs as if set forth fully herein.

6    323.   Defendants have unjustly received and unjustly retained Plaintiffs' and

7    Class Members' money by concealing the provenance of dogs, misrepresenting the

8    dogs as rescues, distributing and selling dogs in violation of the Puppy Mill Ban, and

9    selling Plaintiffs and Class Members accessories and services associated with their

10   purchase of dogs.  California law does not allow sale of commercially bred dogs for

11   profit, and Defendants have done exactly that, at Plaintiffs' and Class Members'

12   expense.

13   324.   Plaintiffs and Class Members seek disgorgement of profits for this unjust

14   enrichment.

15

**REQUEST FOR RELIEF**

16   325.   WHEREFORE, Plaintiffs, individually and on behalf of the Class,

17   request the following relief:

18        a.   An order certifying that this action is properly brought and may be

19             maintained as a class action, that Plaintiffs be appointed the class

20             representative, and that Plaintiffs' counsel be appointed counsel for the

21             Class;

22        b.   An order declaring Defendants' conduct to be in violation of applicable

23             law;

24        c.   An order enjoining Defendants from selling in California dogs sourced

25             from puppy mills or commercial breeders and from transferring such

26             dogs into California for sale.

27        d.   An accounting and disgorgement of Defendants' ill-gotten gains from

28             their unlawful conduct;

e.  Restitution, disgorgement, refund, and/or other monetary damages including but not limited to any compensatory, incidental, or consequential damages, together with costs, disbursements, including reasonable attorneys' fees pursuant to the applicable statutes and prejudgment interest at the maximum rate allowable by law;

f.  Statutory damages in the maximum amount provided by law;

g.  Punitive and/or treble damages in accordance with proof and in an amount consistent with applicable precedent, including those available under 18 U.S.C. § 1964(c) and Cal. Civil Code § 3294;

h.  An award to Plaintiffs and Class Members of reasonable attorneys' fees and costs;

i.  All such other and further relief as may be deemed just, necessary, or proper.

Dated:  December 16, 2021        By:  _____

**ANIMAL LEGAL DEFENSE FUND**

Isabel Callejo-Brighton (SBN 333181)
525 E. Cotati Ave
Cotati, CA 94931
Telephone: 707.795.2533, Ex. 1078
Facsimile: 707.795.7280
Email: icallejo-brighton@aldf.org

Caitlin M. Foley (IL Bar. No. 6323904)*
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
Telephone: 707.795.2533, Ex. 1072
Facsimile: 707.795.7280
Email: cfoley@aldf.org

Ariel Flint (NYS Bar No. 5593991)*
2125 24 St.
Astoria, NY 11105
Telephone: 707.795.2533, Ex. 1058
Facsimile: 707.795.7280
Email: aflint@aldf.org

1

2

3

4 **SMITH & LOWNEY, PLLC**

5 By: _/s/ Claire Tonry_

6
Claire Tonry (WSBA No. 44497)*
7 Knoll D. Lowney (WSBA No. 23457)*
2317 E. John Street
8 Seattle, Washington 98112
Telephone: (206) 860-2883
9 Facsimile: (206) 860-4187
knoll@smithandlowney.com
10 claire@smithandlowney.com
smithandlowney.com
11

12

13 *(_pro hac vices forthcoming_)

14
_Attorneys for Plaintiffs_
15

16

17

18

19

20

21

22

23

24

25

26

27

28